## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHARLES DOHERTY, individually and as
representatives on behalf of a class of
similarly situated persons,

     Plaintiff

       v.

BRISTOL-MYERS SQUIBB CO.
Route 206 & Province Line Road
Princeton, New Jersey 08543,

BRISTOL-MYERS SQUIBB COMPANY
PENSION COMMITTEE
Route 206 & Province Line Road
Princeton, New Jersey 08543

-and-

STATE STREET GLOBAL ADVISORS
TRUST CO.
1 Iron Street
Boston, Massachusetts 02210-1641,

     Defendants.

Case No.

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff Charles Doherty, individually and as representative of a class of similarly situated persons sues Defendants Bristol-Myers Squibb, Co. ("Bristol-Myers"), Bristol-Myers Squibb Company Pension Committee ("The Committee"), and State Street Global Advisors Trust Co. ("State Street"), for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* Plaintiff complains and alleges as follows.

## NATURE OF THE CASE

1.      This case is about one of America's largest and oldest pharmaceutical companies, Bristol-Myers—which traces its lineage to the 19th Century—which lost its way and turned its back on its retired workers by placing the pensions of thousands of its pension plan participants and beneficiaries in peril to secure itself an enormous profit.  Although Bristol-Myers is worth more than $100 billion, the company decided to fatten its wallet by placing its retirees' futures in the hands of a risky new insurance company that is dependent on its Bermuda-based subsidiary. Bristol-Myers' plan was assisted by State Street, itself the offshoot of a financial institution of long standing. Bristol-Myers stood to gain—and did gain—millions of dollars from this scheme, and State Street profited handsomely as well. The only losers in the transaction were Bristol-Myers' retirees, who face the danger—now and in the future—that their lifetime pensions will go unpaid while they have lost all the protections of federal law. Mr. Doherty seeks to right this wrong, and to restore Bristol-Myers' pensioners to their rightful places of financial security by recouping Bristol-Myers' and State Street's ill-gotten gains and otherwise ensuring the safety of his retirement and the retirement benefits of thousands of others.

## BACKGROUND

2.      Bristol-Myers sponsored and operated, and The Committee administered, the Bristol-Myers Squibb Retirement Income Plan (the "Plan"). The Plan was a defined benefit plan protected by ERISA.

3.      In 2019, as part of a scheme to terminate the Plan, to seize Plan assets for its own ends, and to avoid the costs associated with continued sponsorship of the Plan, Bristol-Myers offloaded more than $2 billion worth of pension liabilities—retirement money it had promised to pay thousands of Plan participants and beneficiaries—to Athene Annuity and Life Company and

Athene Annuity & Life Assurance Company of New York, subsidiaries of Athene Holding Ltd. (collectively, "Athene"). In doing so, it removed those Plan participants and former employees from the Plan, placed their retirement benefits beyond ERISA's protections, and terminated the Plan.

4.      As a consequence, Bristol-Myers enjoyed millions of dollars of economic gain..

5.      Bristol-Myers accomplished this result by purchasing "group annuity contracts" from Athene under which Bristol-Myers paid Athene in exchange for Athene assuming the obligation to pay the Plan's participants and beneficiaries their retirement benefits through an insurance policy outside of ERISA's protective regime.

6.      Put simply, to improve its own financial position, Bristol-Myers paid Athene in exchange for Athene agreeing to pay the retirees' benefits as they come due.

7.      Pension industry insiders refer to such group annuity contract transactions as "de-risking" or "Pension Risk Transfers."

8.      Only the latter term, however, is accurate. Bristol-Myers' transaction with Athene was a "de-risking" from Bristol-Myer's perspective. But in truth it was a massive risk transfer from Bristol-Myers to Plan participants and beneficiaries, designed to secure millions for Bristol-Myers.

9.      Although ERISA does not prohibit an employer from transferring pension obligations to an insurance company, ERISA requires that a fiduciary satisfy exacting fiduciary standards when selecting an annuity. *See* 29 U.S.C. § 1104 (mandating that fiduciaries act with the "care, skill, prudence, and diligence" that a prudent person would exercise in like circumstances and "solely in the interests of the participants and beneficiaries"); *see also* 29 C.F.R. § 2509.95-1

("IB 95-1") (explaining that the fiduciary duty imposed by ERISA requires fiduciaries to select the "safest annuity available" and that "purchasing an unsafe annuity" is "never justif[ied]").

10.     Bristol-Myers' transaction did not satisfy these exacting standards.  Before the "annuitization," Plan pension benefits were guaranteed by Bristol-Myers, which was responsible for funding a trust from which to pay pensions and which was obliged to pay the benefits as they came due, even if Plan investments fell short of expectations. Bristol-Myers was also obliged by ERISA's funding requirements to protect the Plan's financial health by making additional contributions to the Plan when necessary. And the benefits were further assured by the Pension Benefit Guaranty Corporation ("PBGC"), the federal agency charged with insuring pension benefits, because Bristol-Myers funded and the Plan paid premiums to the PBGC for retirees.

11.     After the "annuitization," none of this is true. Bristol-Myers no longer guarantees payment of the retirement benefits. Bristol-Myers is no longer subject to ERISA's funding requirements as to these liabilities. The annuitized individuals are no longer Plan participants covered by ERISA's many protections; they have been ejected from the federal pension regime, so the PBGC no longer provides a backstop to ensure that participants and beneficiaries receive their retirement benefits. And Bristol-Myers need not pay PBGC premiums associated with the retirees.

12.     The "annuitized" Plan participants and beneficiaries are now entirely reliant on the solvency of Athene for their retirement benefits.

13.     But Athene was not at the time of the "annuitization," and is not today, an entity to be trusted with the retirement income of many thousands of Americans. Athene is one of a new class of insurers ("Risk-Taking Insurers") engaged in the dicey "shadow banking" sector.

14.    Athene was a highly risky annuity provider for the Plan participants when the "annuitization" occurred, and it remains so today.

15.    Whatever place insurers like Athene have in the financial system, that place is not the American retirement sector given Athene's high-risk, low transparency strategies.

16.    Despite the risk posed by entrusting the pension benefits to Athene, Bristol-Myers and The Committee selected Athene as the annuity provider because Athene's annuities are cheaper than the safer alternatives provided by traditional insurers.

17.    The Plan participants and beneficiaries whom Bristol-Myers unloaded to Athene bear all of the transaction's risk while enjoying none of the profits that Bristol-Myers reaped through its purchase of a much less expensive, but far riskier, annuity than was available and that Bristol-Myers could have purchased.

18.    Thus, the upside of the transaction was enjoyed by Bristol-Myers, which made millions; by State Street, a fiduciary of the Plan which was paid to recommend, assess, and bless the transaction; and by Athene, which was paid to assume the liabilities and is now gambling with retirees' livelihoods.

19.    Through the "annuitization" Bristol-Myers was also able to capture hundreds of millions of dollars in surplus Plan assets and put that money to its own corporate ends.

20.    Before the "annuitization," those Plan assets were held in trust for the exclusive purpose of paying defined-benefit pensions to retirees and defraying reasonable Plan expenses. Those Plan assets were also earmarked to cover future PBGC premiums to backstop Bristol-Myers in the event of a corporate bankruptcy or significant underfunding of the Plan.

21. Thus, instead of using Plan assets to protect retirees by, *inter alia*, paying PBGC premiums, Bristol-Myers converted those assets for its own corporate purposes at the expense of the retirees it was obligated to protect.

22. Congress has, through ERISA, imposed strict fiduciary duties and other obligations upon plan sponsors, administrators, and others to regulate their ability to transfer workers' benefits from the federally regulated pension system to private annuity providers.

23. Such fiduciary duties are particularly important when the "annuitization" is part of a scheme to terminate the plan and when plan assets revert to the plan sponsor so that it can use the money for its own ends.

24. To satisfy ERISA's fiduciary duties, Bristol-Myers, The Committee, and State Street were obliged to act solely in the Plan participants' best interests and to select a safe and reasonable annuity provider.

25. Athene is anything but.

26. Bristol-Myers, The Committee, and State Street did not select Athene because it was the best or safest annuity provider for Plan participants; rather, they selected Athene because it was cheaper *for Bristol-Myers* than safer, traditional annuity providers that have a proven record of the financial strength necessary to shoulder such large and important obligations over a period of many decades.

27. Bristol-Myers, The Committee, and State Street, all of whom are fiduciaries by virtue of their discretionary authority over plan management and administration and control of Plan assets, have thus breached their fiduciary duties under ERISA, and the transaction was prohibited by ERISA.

28.    Plaintiff Doherty brings this action, individually and on behalf of the retirees "annuitized" by Bristol-Myers in 2019—participants and beneficiaries whose pensions are no longer guaranteed by Bristol-Myers or afforded the protections of ERISA—to remedy those violations.

29.    The pensions of these individuals were a guaranteed lifetime income meant to support them through the later years of their lives and to compensate them for decades of faithful service.

30.    Bristol-Myers and State Street have profited at the Plan participants' expense to the tune of many millions of dollars. At the same time, the fiduciary breaches of Bristol-Myers, The Committee, and State Street have caused Plaintiff and the proposed class massive financial injury: because their retirement benefits are now no longer guaranteed by the Plan or Bristol-Myers, covered by ERISA, or protected by the PBGC—and instead depend on Athene's solvency—the present value of those benefits has substantially and quantifiably diminished and there is a substantial risk that Plaintiff will not receive his full retirement benefits.

31.    Plaintiff seeks injunctive relief requiring Bristol-Myers to guarantee the retirement benefits that were part of workers' employment bargain with Bristol-Myers and which those workers earned through their service to Bristol-Myers.

32.    Plaintiff also seeks monetary relief from Bristol-Myers and State Street including the profit those entities earned from the unlawful transaction and losses resulting from their illegal conduct.

## **PARTIES**

33.    Plaintiff Charles Doherty was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7) at all relevant times. He resides in Pleasantville, New York. Mr. Doherty worked

for Bristol-Myers in a series of positions from 1986 until 2000. Mr. Doherty earned retirement benefits, which, because of the Athene transaction at issue, are now in the form of a lifetime monthly annuity backed only by Athene. Mr. Doherty has counted on receiving his pension benefits from Bristol-Myers throughout his retirement. Before his pension benefits were "annuitized" he knew they were safeguarded because Bristol-Myers stood behind them. That is no longer the case.

34.    Bristol-Myers is a multinational pharmaceutical company with a market capitalization exceeding $100 billion. It is one of the largest pharmaceutical companies in the world. It is the Plan's sponsor and one of its fiduciaries with respect to the transaction with Athene because it selected State Street to assist it in offloading liabilities through a group annuity transaction, approved the selection of Athene as the annuity provider, elected to enter into the transaction with Athene, agreed to purchase the group annuity contracts, transferred the billions of dollars' worth of liabilities, and enjoyed millions in profit from the transaction.

35.    The Committee is the Plan's administrator. Its members were appointed, overseen, and monitored by the Compensation and Management Development Committee of the Board of Directors of Bristol-Myers. It is responsible for the general administration of the Plan and is one of the Plan's named fiduciaries.

36.    State Street is a company formed to facilitate State Street Bank and Trust Company's asset management business and State Street Global Advisors' U.S. institutional investment management business. It was at all relevant times a Plan fiduciary with respect to the annuity transactions at issue.

## JURISDICTION AND VENUE

37.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's

claims arise under ERISA, 29 U.S.C. §§ 1001, *et seq.*

38.     The Court has personal jurisdiction over each Defendant.  29 U.S.C. § 1132(e)(2).

39.     When the transaction took place, Bristol-Myers' principal executive offices were

at 430 E. 29th Street, New York, New York 10016. Bristol-Myers has purposefully availed itself

of the privilege of conducting business in this State, by conducting substantial business in New

York, including business related to the Plan. Upon information and belief, Bristol-Myers took

actions in New York that give rise to Plaintiff's claims, namely electing to terminate the Plan and

enter into the group annuity transactions with Athene. At the time of the "annuitization" and since,

Bristol-Myers has had substantial business contacts with the United States, generally, and New

York, specifically, and it would be neither unfair nor unreasonable for Bristol-Myers to face this

suit in New York.

40.     The Committee is an arm of Bristol-Myers. Its members were appointed and

monitored by the Compensation and Management Development Committee, which is appointed

by and acts on behalf of Bristol-Myers' Board of Directors. The Committee's purpose was to

administer the Plan, which at all relevant times was based in New York.

41.     State Street has minimum contacts with the United States, in general, and New

York, in particular. State Street's corporate relatives conduct substantial business in New York,

and, upon information and belief, certain actions taken by State Street with respect to Bristol-

Myers's decision to enter into the annuity transaction with Athene occurred in New York. State

Street chose to advise Bristol-Myers, which was at the time headquartered in New York, to enter

into the annuity transactions. It would be neither unfair nor unreasonable for State Street to face this suit in New York.

42.    Plaintiff resides, and was to receive his pension benefits, in New York.

43.    Venue is proper under 29 U.S.C. § 1132(e)(2).  The Plan was located in this District when the breach took place; the breach occurred in this District, where Mr. Doherty resides; and the defendants may be found in this District.

## ERISA'S FIDUCIARY STANDARDS

44.    ERISA's primary purpose is to protect the retirement security of plan participants and their beneficiaries. The statute achieves its protective purposes by imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably duties of loyalty and prudence. 29 U.S.C. § 1104(a). The statute states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the plan participants and beneficiaries—and
>
> > (A) for the exclusive purpose of
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan; [and]
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

45.    Because the selection of an annuity provider involves the exercise of discretion and implicates fiduciary duties, the Department of Labor has issued regulatory guidance known as IB 95-1, setting forth the legal standard imposed by § 1104(a)(1)(A) and (B) as those provisions relate

to a fiduciary's selection of an annuity provider in connection with a "Pension Risk Transfer." Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

46.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered *per se* violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include entities that a fiduciary may be inclined to favor at the expense of plan beneficiaries. 29 U.S.C § 1106(a)–(b); 29 U.S.C. § 1002(14).

## FACTS APPLICABLE TO ALL COUNTS

### *Background on the Transfer of Pension Benefit Responsibilities to Insurance Companies*

47.     In a defined benefit pension plan, the plan sponsor (typically the employer) agrees to pay monthly pension benefits to retirees as they come due for the rest of the participants' lives, and it funds those benefits through assets contributed both initially and over time by the employer that are invested and held in trust for plan participants.

48.     The employer must pay the pension benefits, even if investment performance falls short of expectations.

49.     The employer must also make additional contributions to the Plan in accordance with ERISA's funding requirements, which demand additional plan contributions in certain circumstances, including if investment returns fall short of expectations and are insufficient to satisfy obligations to plan participants. Thus, the investment risk—the possibility that the plan's

investments will generate insufficient returns to cover the plan's pension obligations and the expenses of operating the plan—is borne entirely by the plan sponsor.

50.     If the sponsor goes bankrupt or otherwise lacks the resources to continue to fund the Plan and pay required benefits, the PBGC steps in as a backstop to pay benefits due.

51.     These features of defined benefit plans make them both valuable and predictable for retirees. Such plans once dominated the American retirement system because they were correctly seen as a way to attract and retain the best workforce.

52.     But because these plans are so valuable to employees, they are conversely expensive for employers. Consequently, as part of a recent trend by employers that sponsor defined benefit plans to improve their bottom lines, numerous sponsors have chosen to shift their liability for monthly pension payments to some or all of the plan participants, to an insurance company through the purchase of group annuity contracts.

53.     The upside of such transactions—enjoyed by plan sponsors—is increased profits; the downside—borne by plan participants—is the increased risk of losing promised retirement benefits, because the annuity provider is unable to perform and the benefits are no longer guaranteed by their former employer and the PBGC.  As alleged further below, the risk of insolvency by the annuity provider is not hypothetical but real.

54.     Although these transactions are now a common way for employers to diminish their defined benefit liabilities (and to profit from such transactions) or to dispense with defined benefit plans altogether, they are not new.

55.     In the 1980s, hundreds of employers terminated their well-funded, federally-insured defined benefit pension plans and bought retirement annuities from a variety of insurance companies, including Executive Life Insurance Company ("Executive Life"), which was then one

of the country's largest insurers, but which had embarked on a disastrous "junk bond" investment strategy.

56.     The pension benefits of approximately 84,000 workers and retirees were transferred from the federally regulated pension system to Executive Life.

57.     Executive Life was often selected by employers because it offered the lowest bid on group annuity contracts. Rather than choose a safer, more expensive annuity, employers placed their own financial interests over plan participants' needs.

58.     Those decisions proved disastrous when, in 1991, Executive Life became insolvent. A significant portion of its assets had been invested in high-risk, high-yield bonds procured through the Drexel Burnham Lambert ("Drexel") investment bank, which then failed due to its risky bond strategy.

59.     The failure of Drexel led to Executive Life defaulting on its annuity contracts, thereby failing to make good on its obligations to tens of thousands of pension annuitants. State regulators were required to seize the company in April 1991 to prevent a run. The debacle resulted in massive losses to pensioners.

60.     Members of Congress were outraged by Executive Life's implosion and its impact on retirees. In response, they enacted the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401 (Oct. 22, 1993) ("PAPA"), as an amendment to ERISA in order to prevent similar crises and ensure that plan participants would have legal recourse against risky pension transfers by plan fiduciaries. Through this amendment, ERISA now provides expressly that plan participants and beneficiaries ejected from the federal pension regulatory system by a plan sponsor's purchase of annuities may sue for relief to, *inter alia*, assure the receipt of the benefits to which they are entitled. 29 U.S.C. § 1132(a)(9).

61.    And in 1995, the Department of Labor promulgated IB 95-1, which—like PAPA—aimed to prevent the irresponsible transfer of pension liabilities to insurance companies that are not sufficiently secure to guarantee retirement benefits, a principal animating force behind the enactment of PAPA and indeed ERISA itself. IB 95-1 has since been updated consistent with that purpose.

62.    IB 95-1 provides courts, regulated entities, and the public with the Department of Labor's expert guidance on the fiduciary standards that apply under ERISA to the selection of an annuity provider when a fiduciary transfers defined benefit pension liabilities to an annuity provider. *See* IB 95-1(a).

63.    It explains that selecting an annuity provider is a fiduciary decision under ERISA, 29 U.S.C. § 1104(a), and that employers therefore must act solely in the interest of the plan's participants and beneficiaries and in accordance with ERISA's strict prudence standard when selecting an annuity provider. IB 95-1(b) (citing 29 U.S.C. § 1104(a)).

64.    Thus, to meet their loyalty and prudence obligations in selecting an annuity provider, fiduciaries must "take steps calculated to obtain the safest annuity available, unless the interests of the participants and beneficiaries demand otherwise." Fiduciaries must also, at a minimum, "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities." IB 95-1(c).

65.    In performing that analysis, plan fiduciaries must consider, among other things:

    i.   the quality and diversification of the annuity provider's investment portfolio**;**

    ii.  the size of the insurer relative to the proposed contract;

    iii. the level of the insurer's capital and surplus;

iv.   the lines of business of the annuity provider and other indications of an insurer's exposure to liability;

v.   the structure of the annuity provider and other indications of an insurer's exposure to liability;

vi.   the availability of additional protection through state guaranty associations and the extent of their guarantees.

66.    In addition, IB 95-1(d) makes clear that a fiduciary violates its duty to act in the best interest of plan participants and beneficiaries if it purchases a riskier, lower-priced annuity to maximize a reversion for the benefit of the plan sponsor.

### *The Private Equity-Backed, Risk-Taking Insurers*

67.    Since Executive Life's collapse, the pension risk transfer market had been dominated by traditional annuity providers, including household names such as MassMutual and New York Life.  But more recently a new class of annuity providers has entered the market. These are the "Risk-Taking Insurers."

68.    Private equity firms began purchasing insurance companies primarily to finance their operations. Today, they have moved beyond this business into those of private credit and insurance by greatly expanding their purchase of life insurers. This has heightened the influence of private equity firms over the annuity insurance industry, allowing those firms to own life insurers while also serving as their asset managers. As of 2023, private equity firms had spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015.

69.    These new Risk-Taking Insurers are more likely than traditional annuity providers to become insolvent now and in the future. Many (i) have not been tested through a full economic

cycle and have never weathered a recession; (ii) re-insure annuities with offshore insurance companies that are not required to set aside as much capital as the traditional U.S.-based insurance companies; and/or (iii) invest in assets that are riskier, less liquid and more opaque than those invested in by traditional providers, such as collateralized loan obligations ("CLOs"), asset-backed securities, private fixed-income placements, subordinated debt, and even the stock of affiliated companies.

70.     In addition, the mission of private equity does not align with the best interests of policyholders. Not only do private equity firms receive cash from premiums that can be invested into their other affiliated businesses, but they can also generate significant investment management fees for themselves. Because private equity firms focus on maximizing their immediate financial returns, their entry into the insurance business poses danger: a chief aim of the insurance business is ensuring that promised retirement benefits are there at the end of the day for policyholders and failure on that front can put policyholders at very significant risk.

71.     Independent industry experts, scholars, and journalists have sounded the alarm that these new Risk-Taking Insurers are unstable and even threaten the wider financial system.

72.     Three economists at the Board of Governors of the Federal Reserve System have recounted how some insurers have, since 2009, developed "a new shadow banking business model that resembles investment banking in the run up to the 2007–09 financial crisis. These life insurers profit by lending to highly-leveraged firms. In particular, they originate risky loans, hold them, and securitize them in [collateralized loan obligations]." By extending credit to "risky projects," these insurers "earn a sizeable spread over the cost of their fixed-annuity liabilities." The paper "show[s] that these life insurance companies hold some of the riskiest portions of the CLOs issued by their own affiliate asset managers against virtually no capital." It also shows that "[t]he shadow

banking business of life insurers exponentially increases the industry's vulnerability to aggregate corporate-sector shocks." In short, certain insurers have, since the 2008 financial crisis, "filled a void left by banks in risky corporate loan markets." In doing so, they have "create[d] and become vulnerable to run risk," the likelihood that such insurers could see their assets shrink quickly and irreversibly when markets turn down. The paper identifies Athene as an example of an insurer with a shadow banking business.

### *Athene: A Paradigmatic Example of a Risk-Taking Insurer*

73. Athene is, in fact, a perfect example of a Risk-Taking Insurer. It is owned by the private equity giant Apollo Global Management ("Apollo"), which was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered bankruptcy (and thereby caused the collapse of Executive Life). Leon Black was not only the co-head of Drexel during Executive Life's junk bond binge, but also the financier who purchased Executive Life's discounted assets after its implosion. Apollo found a way to make money off the retirement savings of millions of everyday Americans by buying out corporate retirement obligations cheaply and then backing up their resulting annuity obligations through collateralized loans and other risky assets.

74. Apollo's relationship with Athene is longstanding. Athene was an important part of Apollo's investment portfolio before 2019, and in October 2019, Apollo nearly doubled its interest in Athene to 35%, while Athene purchased a significant equity stake in Apollo.

75. When Apollo announced its merger with Athene, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo. Today, approximately one-fifth of Athene's portfolio is invested in risky asset-backed securities and leveraged loans made to companies highly

in debt, and approximately 80% of its "Pension Risk Transfer" liabilities are reinsured through Bermuda affiliates owned by Athene's parent, Apollo. Apollo collects asset management fees on *all* of the investments that it manages for Athene.

### Athene's Complex and Risky Offshore Practices Threaten Pensioners.

76.     Athene and Apollo pioneered much of the risky conduct characteristic of the Risk-Taking Insurers. Athene is today a prime example of an insurer that has grown its shadow banking business by assuming an organizational structure that allows it to engage in risky conduct with former pension plan assets. As with other insurers engaging in such shadow banking, a central feature of Athene's organizational structure is the location of its captive reinsurers, Athene Life Re Ltd. and Athene Annuity Re Ltd.—both headquartered in Hamilton, Bermuda to take advantage of Bermuda's favorable (more lax) regulatory regime.

77.     Athene's use of complex investment structures under lax regulatory standards has contributed to its higher risk as an annuity provider.

78.     In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero. For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and CLOs, even though some CLOs have greater downside risk than bonds with the same credit rating.

79.     The reinsurance of "Pension Risk Transfer" liabilities in Bermuda poses unique risks to pensioners. Bermuda reinsurers report under Bermuda accounting standards rather than United States Statutory Accounting Principles ("U.S. SAP"), which is the required reporting regime for all U.S.-based insurance companies. Under U.S. SAP, insurers must file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed-

income investments, U.S.-based insurers report all individual stock and bond purchases and sales, including CUSIP numbers, which are unique identifiers assigned to stocks and registered bonds. By contrast, under Bermuda standards, Athene's affiliated reinsurers report only in the aggregate with no individual stock and bond level purchase or sale information. Further, Bermuda standards allow for investments in assets that would not qualify as suitable under U.S. SAP.

80.    The lack of transparency in the reporting by Athene's Bermuda reinsurers is stark. To illustrate, Athene's current statutory financial statements for its principal U.S. insurer is 3,939 pages long, whereas the Athene Bermuda entities' consolidated report filed under Bermuda standards is 59 pages long.

81.    In addition, Athene's excessive reliance on affiliated offshore reinsurance today is troublesome for those whose retirement benefits are affected by "Pension Risk Transfers," for numerous reasons. Whereas arm's-length reinsurance, with pricing set by the marketplace, can improve policyholder security by diversifying and sharing fully transparent risk with strong, independent financial partners, reinsurance with a commonly-owned affiliate allows for self-dealing, as pricing is not set by the marketplace. This potential is exacerbated when the affiliated reinsurer is located in an offshore jurisdiction with more lax standards, which leaves the reinsurer's management free to do virtually anything with the extra funds. As a result, captive reinsurance allows insurers to gain multiple advantages, including the ability to price annuities lower than other competitors but at greater risk to the annuitants. That is the case for Athene because both it and its reinsurer are today owned by Apollo.

82.    Life insurance and annuity companies are required to maintain surpluses to ensure long-term solvency, but those with captive reinsurers use them to back their liabilities with assets that would not be "admitted" (that is, accepted) by insurance company examiners in their own

domiciles. In other words, reinsuring liabilities with captive reinsurers – the practice followed by Althene -- frees up excess capital for profit generation, or stockholder dividends, but does not decrease risk.

83.     The amount of an insurer's surplus is critically important. It measures an insurer's total assets less its liabilities. The surplus to liabilities ratio indicates an insurer's ability to pay claims from policyholders because it is the only buffer between an insurer's solvency and default during economic downturns. If an insurer's assets are written down, or its liabilities are written up, the amount of surplus will be reduced accordingly. And the likelihood of this occurring is increased when an insurer holds riskier assets. In fact, Athene's 2024 second-quarter profit fell 11% from just one year ago due to a drop in income from alternative investments related to Apollo and the roll-off of annuity business written during the peak of the pandemic according to Life Annuity Specialist.

84.     Athene has maintained one of the smallest surplus levels among life insurance and annuity carriers.  New York Life's surplus-to-liabilities ratio, for example, is far higher than Athene's. The comparison of this simple measure highlights the risk taken by Athene in contrast to safer annuity providers.

85.     Athene also reports a very large amount of modified co-insurance ("ModCo") arrangements with its Bermuda affiliates.  Other insurers, including New York Life and TIAA, have typically reported little to no ModCo with offshore affiliates.

86.     ModCo arrangements are those in which an insurer (the "ceding carrier")  that is transferring risk to a reinsurer maintains both the premiums and reserves associated with the reinsured policies on its balance sheets. These arrangements create the appearance that the ceding

carrier is financially stronger than it actually is.  They are particularly risky for pensioners severed from ERISA plans by "Pension Risk Transfers."

87.    Such arrangements allow Athene to remove risky assets from its own reported Risk Based Capital ("RBC") ratio. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay policyholders (or annuitants) based on its level of risk. Athene's use of ModCo arrangements has the effect of artificially inflating its RBC ratio, which in turn allows Athene to hold a substantially lower amount in minimum required surplus. That is because, in Bermuda, insurers who hold riskier assets with higher credit spreads (or higher returns) are able to value their liabilities at a lower rate. Athene's manipulation of its RBC ratio masks just how risky annuities from Athene are, as alleged further below.

88.    Athene's excessive use of offshore affiliated reinsurance, including ModCo, therefore obscures its true financial condition and exposes pensioners, including Plaintiffs, to even more substantial risk.

89.    Put simply, Athene's use of financial alchemy makes it dramatically under-reserved today.

90.    Athene also has a very high concentration of risky assets relative to its surplus. For example, Athene holds large amounts of "other loan-backed and structured securities" by comparison to its surplus.  New York Life, on the other hand, holds much smaller amounts of such assets relative to its surplus.

91.    And today Athene's affiliated transactions are, on information and belief, also dramatically understated. It is publicly known that Apollo has had a long-term practice of bundling asset-backed notes and selling those notes to Athene in exchange for upfront cash and future management fees.  This practice dates back to at least 2018-19.

92.     Athene is a prime example of a Risk-Taking Insurer that has used what experts refer to as the "Bermuda Triangle Strategy" to generate profits. The first side of the triangle is the U.S. life insurer (e.g., Athene), which builds a block of annuity business through "Pension Risk Transfers" like the one at issue here. The second side of the triangle is the affiliated offshore reinsurers (e.g., Athene Life Re Ltd.), which accept the purchased insurance liabilities from the insurer and thereby free up annuity capital for use in the organization's private debt business. And the third side of the triangle is the affiliated asset manager (e.g., Athene Asset Management) which originates, acquires, and manages private debt.

93.     A triangle may sound stable, but this triangle is far from it. The interdependence between Athene and its in-house reinsurer exposes each of these entities to a heightened risk of failure. The risks that Athene's separate account (for the "Pension Risk Transfer" at issue here), and then its general account would be insufficient to cover its liabilities, forcing Athene to seek payment from its affiliated reinsurer for a portion of the annuity liabilities, are closely correlated events that are tied to Athene's weak financial condition relative to other insurers. Because Athene is dramatically under-reserved relative to peers, as shown through its thin surplus and dramatic increase in liabilities, in a liquidity crisis or shortfall, it would be entirely dependent on IOUs from its own captive in-house reinsurer, which is essentially itself. And any inability to satisfy Athene's general account obligations would cause a downgrade in its credit preventing it from raising funds in the credit markets.

94.     Moreover, to the extent Athene assertedly maintains a separate account that is used to pay benefits to Bristol-Myers retirees, that account is not "ring-fenced" or insulated from Athene's general liabilities. According to GACs issued by Athene for other similar PRTs, the separate account would hold assets supporting the contract. However, the separate account assets

may also be used to support Athene's payment obligations under other separate GACs issued by
Athene. And on a quarterly basis but no less frequently than annually, Athene may also withdraw
assets from the separate account and transfer them to its general account if the market value of the
assets in the separate account exceeds Athene's liabilities under the GAC.

95.    In sum, Athene's use of riskier investments and interrelated corporate strategies is
in stark contrast to traditional insurers. For instance, New York Life maintains substantially more
traditional, lower-risk investments than Athene and engages in no captive reinsurance.

96.    Apollo has expressly recognized that "Pension Risk Transfers" involving its
affiliated companies may generate conflicts of interest relating to the GAC purchase price and the
amount of investment management/advisory fees that Apollo affiliates charge for managing the
underlying pension assets and liabilities. Despite this admission, Apollo has undertaken no efforts
to mitigate those conflicts.

### Athene is Not Sufficiently Creditworthy to Ensure Payment of Plaintiffs' Retirement Benefits.

97.    Objective measures illustrate that the annuities that Bristol-Myers purchased from
Athene were not the safest annuities available—or even close.

98.    At least one set of independent analyses (the "NISA Reports") has explained why
an ERISA plan sponsor may not, consistent with its fiduciary duties and the risk factors outlined
in IB 95-1, transfer pension liabilities to Athene. The NISA Reports found that industry-wide
"Pension Risk Transfers" to lower quality insurers, like the transfer at issue here, harm pensioners
by as much as $5 billion annually through uncompensated credit risk.[1] The NISA Reports quantify

---

[1] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022,
https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.  The NISA
Reports assess relative risk as of 2022 but, on information and belief, comparable levels of risk for Athene existed in
2018 and 2019.

the extent to which Athene is neither a safe nor a reasonable annuity choice for ERISA fiduciaries. The reports conclude (as illustrated in NISA's Figure 2 below) that Athene is substantially riskier than multiple traditional annuity providers and approximately 14% riskier than, for example, New York Life:

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

99.     They reach that conclusion by using the bond market as a measure of risk—a necessity given the NISA Reports' finding that insurance company balance sheets are exceedingly complex and opaque, especially given the use of Bermudian reinsurers.

100.    The bond market provides a market-based measure of creditworthiness because a bond's spread over U.S. Treasuries is the additional compensation an investor demands to accept the credit risk of holding a bond from a particular issuer as compared to the U.S. government. This additional compensation over U.S. Treasuries is referred to as the "risk premium" for a given bond. The market price of Athene's bond risk is 21.4% higher than U.S. Treasuries, as compared to the safest annuity provider analyzed by the NISA Reports (New York Life), whose market price is

7.4% higher than U.S. Treasuries. The risk premium for Athene's bonds is thus almost three times the risk premium for New York Life.[2]

101.    In fact, this analysis understates the true risks to beneficiaries of a plan transferring benefits liabilities to Athene.  The market spread on bonds is set by the marginal buyer, a buyer who by definition would have bond holdings that represent only a small portion of that buyer's overall, diversified portfolio.  By contrast, the pension of a typical retiree receiving an annuity is a significant portion of their retirement income.   Such retirees would, if they had a choice (which Plaintiff did not have in this case), demand additional compensation for Athene's riskiness.

102.    The NISA analysis separately compared the agency rating of Athene to its market-adjusted implied rating based on the bond market. The analysis found that although Athene had an A+ rating (like Executive Life before its downfall), Athene's implied rating was BBB-, the lowest rating among all reported annuity providers.[3]

---

[2] *Id.,* Figure 2.
[3] *Id.,* Figure 1.

**FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness**

|  | (A) NY Life | (B) Prudential | (C) MassMutual | (D) AIG | (E) MetLife | (F) Principal | (G) PacLife | (H) F&G | (I) Athene |
|---|---|---|---|---|---|---|---|---|---|
| Agency Rating | AAA | AA- | AA+ | A | AA- | A+ | AA- | A- | A+ |
| Market Implied Rating | AA | AA | AA | A+ | A | A- | BBB+ | BBB | BBB- |
| Observed Market Spread | 74 | 76 | 84 | 102 | 106 | 147 | 158 | 186 | 214 |

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Agency Rating vs. Market Implied Rating

(A) NY Life: AAA → AA
(B) Prudential: AA- → AA
(C) MassMutual: AA+ → AA
(D) AIG: A → A+
(E) MetLife: AA- → A
(F) Principal: A+ → A-
(G) PacLife: AA- → BBB+
(H) F&G: A- → BBB
(I) Athene: A+ → BBB-

Source: Bloomberg, 8/31/2022 NISA calculations.

103. The reported range in (NISA) Figure 1 above is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch"). By agency, the ratings range as follows from highest to lowest: S&P (AAA to D), Moody's (Aaa to C), and Fitch (AAA to C).

104. An A+ rating for Athene noted above should not be interpreted as suggesting that Athene is on par with safer annuity providers. As shown, there are levels of safety above A, including AA and AAA. New York Life and MassMutual, for example, maintain higher credit ratings due to their stronger creditworthiness.

105.    The differences in credit ratings have a material impact on the likelihood of default. Athene has a Moody's rating of A1 (or A+ for S&P) in contrast to New York Life, which maintains a credit rating of Aaa (or AAA for S&P).

106.    Moody's has reported the average cumulative issuer-weighted default rates by issuer credit rating from 1970 through 2021. Over a 20-year time horizon, the default rates for riskier issuers are apparent. The default rates are only 0.7% for Moody's Aaa ratings compared to 5.0% for its A ratings. Thus, over a 20-year time horizon, the default rate of bonds with Athene's rating is almost seven times higher than those of a high-credit quality issuer. And the differential among default rates for them would be even greater over a 30-year time horizon. This differential is yet another indicator of the risk that pensioners have assumed with Athene.

107.    Athene's transition out of the life insurance business also contributes to its higher risk as an annuity provider. An insurance company that provides life insurance is considered a natural hedge to an annuities business. In 2013, most of Athene's life insurance business was acquired by another company, Accordia Life and Annuity Company, and by 2016, Athene had completely transitioned out of the business. Therefore, the important hedge to Athene's annuities business of providing life insurance no longer exists.

108.    Put simply, Athene today is, according to multiple objective measures, the least safe annuity provider—even among the category of least safe annuity providers of those analyzed in the NISA Reports. The annuities purchased by Bristol-Myers were thus not safe, much less the safest annuities available. The Plan participants whose benefits have been annuitized through the "Pension Risk Transfer" with Athene receive none of the upside of Athene's inherently risky "value proposition." The risk posed by Athene could be worthwhile to Plan participants, at least theoretically, if they were to enjoy increased benefits that compensated them for Athene's risk of

failure. But that is not the case for Plan participants, and it is never the case for defined benefit plan participants, because their benefits are fixed.

### *Athene also relies on unreliable, private letter ratings.*

109.    Since at least 2017, Athene has also relied on unreliable and misleading credit ratings from suspect private credit rating organizations, which should have been a cause of serious concern to Defendants when they decided to annuitize Plaintiffs' pension benefits.

110.    The CLOs in which Athene invests are a type of structured debt divided into different tranches with varying risks and returns, so their creation depends on private letter ratings from private credit rating agencies rather than more stringent public ratings from the Securities Valuation Office of the National Association of Insurance Commissioners ("NAIC") and those provided by major rating agencies, such as S&P, Moody's, and Fitch. Two such private credit rating agencies from which Athene obtains ratings are Kroll Bond Rating Agency ("KBRA") and DBRS Inc. ("DBRS").

111.    In 2019, the Wall Street Journal ("WSJ") found significant discrepancies among structured securities ratings, including those of CLOs, between the major ratings agencies and the so-called "challenger" ratings agencies—DBRS, KBRA, and Morningstar. The WSJ found that across most structured-finance segments, challengers were more likely to give higher grades than the major ratings agencies on the same bonds, resulting in the classification of a bond as "junk" by major ratings agencies while challenger rating agencies would rate it as a very safe AAA bond.

112.    This problem persists because bond issuers can pay for their ratings by choosing to purchase ratings from only those agencies which are more likely to issue higher ratings. According to the WSJ, there is an added incentive to hire the most lenient rating firm, because interest payments are lower on higher-rated bonds. And as major ratings agencies lose out on business to

more lenient challenger ratings agencies, they adjust their standards downwards so that they can continue to compete. These ratings are important because a higher-rated structured security requires lower levels of capital to be held by the insurer.

113.    Both KBRA and DBRS have been fined millions of dollars by the SEC based on their rating practices, and the SEC recently found that KBRA failed to establish, maintain, enforce and document the required policies and procedures surrounding their ratings of certain CLOs, resulting in inaccurate ratings that did not fully account for cash flows payable to noteholders and which would almost certainly pose a threat to policyholders in the case of insolvency. DBRS has also paid millions of dollars in civil penalties for violating Section 17(a)(1) of the Exchange Act and Rule 17g-2(b)(7) related to its internal credit rating practices.

114.    Despite years of documented wrongdoing by KBRA and DBRS, involving extensive failures to comply with SEC credit rating policies and procedures, Athene continued to retain both companies for rating services. Indeed, KBRA and DBRS provided private rating services to Athene from 2017 through 2023. Athene's reliance on these ratings agencies is a red flag, which Defendants either ignored or failed to identify, by failing to properly vet Athene before selecting it as the annuity provider.

**Athene has been the subject of investigation and was found to have violated the law.**

115.    Athene has been investigated by the State of New York for misconduct regarding its "Pension Risk Transfer" business and was found to have violated New York law. In January 2019, the New York State Department of Financial Services initiated an investigation into Athene Annuity and Life Company and Athene Holding Ltd. The agency concluded from its investigation that Athene Annuity and Life Company had violated New York law by conducting insurance business related to its "Pension Risk Transfer" business without a license. As a result of the

investigation, Athene Annuity and Life Company and Athene Holding Ltd. were ordered to pay a $45 million civil monetary penalty and satisfy other conditions.

### *The Bristol-Myers–Athene Transaction*

116.    In or around November 2018, Bristol-Myers and The Committee engaged State Street to assist Bristol-Myers in offloading its pension liabilities.

117.    Specifically, Bristol-Myers and The Committee engaged State Street's "Independent Fiduciary Services" team to assist in the process of selecting an annuity provider.

118.    State Street has publicly stated that it is "[b]lazing the trail into the mega-pension transfer market."

119.    Specifically, Bristol-Myers sought assistance from State Street's "Independent Fiduciary Services team." A key service offered by the Independent Fiduciary Services team— and, according to State Street, "often one of the reasons why companies decide to hire" supposedly independent fiduciaries like them—is that hiring State Street, as a third-party and purportedly neutral advisor, "may help in the event of litigation."[4]

120.    When State Street represents that hiring it "may help in the event of litigation," it means that engaging it to assist with annuitization helps provide employers with legal cover in the form of a justification that State Street complies with IB 95-1 when it plays a role in the selection of an annuity provider.

121.    In fact, State Street has conceded the applicability of IB 95-1 to annuitizations like the one at issue here, both publicly and in legally binding documents.

---

[4] https://www.ssga.com/us/en/institutional/ic/insights/how-independent-fiduciary-services-evolved.

122.    State Street represents, for example, that its "team of independent fiduciary services specialists continue to support clients seeking to transfer liabilities to insurance companies in the form of annuitizations" in light of the new insurance landscape that, according to State Street, has "increased 'safest available annuity' options available to independent fiduciaries and other fiduciaries." *Id.* (quoting and citing IB 95-1).

123.    And State Street has represented in its engagement agreements for materially identical PRTs that it will perform its work in selecting an annuity provider "in accordance and compliance with ERISA, including the requirements of the U.S. Department of Labor's IB 95-1."

124.    In advising Bristol-Myers to offload the pension liabilities, State Street was acting as a fiduciary of the Plan.  State Street received financial compensation for the services it provided to Bristol-Myers.

125.    Based on a decision made by Bristol-Myers on State Street's recommendation, The Committee, and State Street, Bristol-Myers and Athene entered into what Bristol-Myers has called a "first-of-its-kind-plan termination solution."

126.    The "solution" involved terminating the Plan and offloading large amounts of pension benefit obligations to Athene.

127.    From Bristol-Myer's perspective, the upside of the "solution" was, in its words, to reduce Bristol-Myers Squibb's future risk and administrative costs.

128.    The "annuitized" pension benefits exceeded $2 billion and were offloaded in two tranches: one in the third quarter of 2019 and one in the fourth quarter of 2019.

129.    Those group annuity contracts resulted in the "annuitization" of thousands of Plan participants.

130.    Bristol-Myers had an acute incentive to purchase a cheaper annuity because 2019 was a relatively low interest rate environment, which meant that annuity prices were relatively high.

131.    Bristol-Myers' incentive to purchase cheap, risky annuities was further heightened by the fact that, in 2019, 93% of Plan participants and 86% of the liabilities in the Plan were associated with "active" and "terminated vested" participants.

132.    Annuities for "active" and "terminated vested" participants (those who *have not* begun to receive benefits) are generally more expensive than annuities for "pay status" participants (those who *have* begun to receive payments) because there is greater risk and uncertainty related to the timing, form, and amount of future payments when the participant has not yet begun to receive payments.

133.    Thus, from Bristol-Myers' perspective, the overwhelming majority of participants in the Plan in 2019 were "bottom-of-the-barrel" participants who would be relatively expensive to "annuitize"—a fact that increased the incentive for Bristol-Myers to prioritize obtaining a cheap annuity for those individuals.

134.    Indeed, this scheme required the implementation of the largest-ever full plan termination involving mostly "active" and "terminated vested" participants.

135.    Bristol-Myers used Plan assets to purchase the group annuity contracts.

136.    Bristol-Myers also used Plan assets to pay State Street $210,000 in 2019.

137.    Upon information and belief, some or all of those funds were used to pay State Street for the group annuity contract-related services that State Street provided to Bristol-Myers.

138.    Athene is now solely responsible for paying the monthly benefits; Plan participants covered by the transfers have been terminated as participants in the Plan; and such participants no

longer enjoy any of the benefits intended by Congress under ERISA, including the protections and backstop provided by the PBGC.

139.    Bristol-Myers entered into the group annuity contracts because it anticipated a large corporate benefit from offloading the liabilities, given that Athene's annuities were substantially cheaper than the far safer annuities offered by traditional insurers.

140.    The annuities sold to Bristol-Myers by Athene were in fact cheaper than those offered by traditional insurers.

141.    The selection of Athene as the annuity provider thus enabled Bristol-Myers to enjoy millions in economic gain.

142.    And the "annuitization" scheme resulted in an approximately $419 million surplus of Plan assets that Bristol-Myers used to pay a completely different general corporate obligation— to fund future matching employer funds for participants in its distinct and separate defined-contribution pension plan, boosting profits by saving the company the money it would have otherwise have been required to pay from corporate revenues.

143.    Bristol-Myers was also able to take as a reversion an additional $381 million in surplus pension plan assets that had been set aside in an account to provide retiree medical benefits for participants.

144.    Had Bristol-Myers, The Committee, and State Street selected an annuity provider that was safer and more expensive than Athene, these surpluses would have been smaller.

145.    Bristol-Myers benefited dollar-for-dollar from the savings resulting from the selection of Athene as the annuity provider.

146.    That reversion of surplus to Bristol-Myers is only a small portion of the financial advantage that it has reaped and will reap from the transaction.

147.    Bristol-Myers will, in addition, enjoy administrative cost savings due to "annuitizing" the thousands of Plan participants. Because the benchmark range of such costs is $50–100 per participant per year, Bristol-Myers has likely profited and will likely profit by millions of dollars in saved administrative costs over the lifespan of its "annuitized" retirees.

148.    Bristol-Myers will also profit from the transaction by saving on flat-rate and variable-rate premiums that are paid to the PBGC to insure the benefits of the "annuitized" retirees.

149.    Because of the "annuitization," Bristol-Myers and the Plan are no longer required to pay annual flat-rate PBGC premiums for the participants terminated from the Plan, which will save Bristol-Myers millions more annually.

150.    And the amount of variable-rate premiums over the lives of the retirees is also likely to be substantial, measuring in the millions of dollars. It is likely that Bristol-Myers had historically paid significant amounts of this additional premium.

151.    All told, Bristol-Myers' additional economic gains from the avoided premiums likely measure in the tens of millions of dollars, if not more.

152.    Although State Street was nominally engaged to provide compliance advice to Bristol-Myers to ensure that Bristol-Myers selected an annuity provider in satisfaction of its fiduciary obligations, State Street's true role was to give the appearance of legitimacy to Bristol-Myers' selection of Athene as an annuity provider.

153.    On information and belief, Bristol-Myers, The Committee, and State Street did not conduct an independent, impartial investigation aimed at identifying and selecting an annuity provider in Plan participants' best interests.

154.    The risk posed by Athene as of 2018–19 would have been ascertainable to highly sophisticated business entities with fiduciary obligations, such as Bristol-Myers, The Committee, and State Street, had they engaged in an inquiry that was reasonable under the circumstances.

155.    In the pension plan liability transfer industry, it is customary for plan fiduciaries to solicit bids and information from insurers to ensure that the transfer is in the plan participants' best interest.

156.    Bristol-Myers and State Street either did not solicit bids and other information that would have revealed that Athene was not a safe or reasonable selection, or they ignored or unreasonably disregarded such bids and information.

157.    When Bristol-Myers and State Street selected Athene as the entity to which they would transfer billions of dollars' worth of pension liabilities, they made a choice that was neither safe, reasonable, nor prudent.

158.    Nor did Bristol-Myers and State Street make the safest available choice or the choice that was in the best interest of Plan participants; in fact, they did the opposite.

159.    Indeed, both in 2018–19 and today Athene flunks multiple tests for whether an annuity provider is a safe or reasonable choice, including because (i) Athene lacks a sufficient track record to be entrusted with guaranteeing such a massive amount of pension liabilities (and lacked it to an even greater degree in 2018–19); (ii) Athene today is, compared to traditional providers, invested in riskier assets to support participants' payments, (iii) Athene's risk is increased by its reinsurance of annuities with offshore companies affiliated with Athene which are not as transparent or required to set aside as much capital as U.S.-based insurers; (iv) Athene uses excessive amounts of ModCo to artificially inflate its Risk Based Capital ratio; and (v) the risks inherent in Athene's strategies are magnified by unstable economic conditions.

160.    Based on this information and that available to sophisticated entities like Bristol-Myers and State Street, the selection of Athene would have been an unreasonable choice, even if the selection of Athene had not led to an attendant economic benefit for Bristol-Myers and even if Athene's pricing was not more favorable to Bristol-Myers than that of a traditional annuity provider.

161.    It should come as no surprise that State Street—ignoring the public red flags attached to Athene—has routinely rubber-stamped Athene as an annuity provider to displace retirees' longstanding, valuable rights to ERISA-protected pension benefits.

162.    Since 2018, State Street has recommended Athene for no fewer than ten "Pension Risk Transfers," shifting more than $30 billion in pension liabilities from the federally regulated pension system to Athene.

163.    And State Street has apparent financial incentives to recommend Athene to serve as the annuity provider in "Pension Risk Transfers."

164.    State Street offers a financial product backed by Athene.

165.    State Street is also one of the largest shareholders of Apollo, Athene's parent company.

166.    And State Street provides custodial services for Athene's insurance products, according to its regulatory filings.

167.    Under such circumstances it was unreasonable and a violation of Bristol-Myers' and The Committee's fiduciary duties for them to select State Street as an independent fiduciary of the Plan.

168.    Bristol-Myers and The Committee either failed to engage in a thorough, independent investigation of available independent fiduciaries for the Plan, or ignored the results of such an investigation.

169.    Had they conducted an impartial investigation of available independent fiduciaries they would have discovered that State Street had a relationship and dealings with Athene that could and, upon information and belief, did impact the independence of the fiduciary services that State Street offered, especially given the numerous factors that would lead a loyal and prudent fiduciary to conclude that Athene was not a reasonable or safe annuity, much less the safest annuity available.

### *By shedding the responsibility to pay Plaintiffs' benefits to Athene, Defendants degraded the value of Plaintiffs' retirement benefits.*

170.    The "Pension Risk Transfer" to Athene immediately diminished the present value of Plaintiff's benefits.

171.    The selection of Athene replaced the valuable benefits to which Plaintiff was entitled with benefits that were substantially and quantifiably less valuable.

172.    Riskier assets are, all else equal, worth less than safer assets.  Athene annuities have a higher credit spread relative to U.S. Treasuries, and thus have higher risk than annuities offered by other insurers.  That was also true when Defendants undertook the "Pension Risk Transfer." Thus, the annuities from Athene are worth measurably less than the annuities would be worth if issued by another insurer.

173.    State Street thus has a history of being hired by companies to act as a so-called "independent fiduciary," performing a process which—to the surprise of no one—identifies Athene as the annuity provider of choice.

174.    Before the "annuitization", the risk that Plaintiff would not receive the pension benefits to which he was entitled was negligible. There was no realistic probability that the Plan would not be sufficiently funded to pay the benefits *and* that Bristol-Myers would fail *and* that the PBGC would fail to pay Plaintiff's benefits. There was no safer place for his pension benefits, or those of the proposed class.

175.    After the "annuitization," the risk that Plaintiff will not receive the benefits to which he is entitled is large. Because of the group annuity transactions, Plaintiff is no longer a member of the Plan, and his monthly retirement benefits are thus backed by only Athene—not the Plan, Bristol-Myers, or the PBGC.

176.    Based on Athene's current and likely future financial position, there is a substantial probability that it will fail to make good on its obligation to pay Plaintiff's retirement benefits, and the economic gains realized by Bristol-Myers are at least a rough proxy for the harm to retirees from being terminated as plan participants and having their pension benefits secured through a risky annuity with Athene.

177.    Athene is, in fact, one of the least safe annuity providers in the market.

178.    The transaction thus greatly increased the risk—and indeed created a substantial risk—that Plaintiff will not receive the retirement benefits that he has earned and which he is owed.

179.    The selection of Athene injured Plaintiff the moment the transaction was executed because, at that moment, the present material and economic value of Plaintiff's promised benefits was substantially and quantifiably diminished.  And the annuitization greatly increased the risk—and created a substantial risk—that Plaintiff will not receive the retirement benefits that he has earned and which he is owed.

## CLASS ALLEGATIONS

180.     Plaintiff is empowered by law to bring this action under 29 U.S.C. § 1132(a)(2), (1)(3) and (a)(9).

181.     Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23. He seeks to represent the thousands of "annuitized" Plan participants (the "Class").

182.     <u>Numerosity:</u> The Class, which includes thousands of terminated Plan participants, is so numerous that joinder of all members is impracticable.

183.     <u>Commonality:</u> There are questions of law and fact common to the class because class members' claims are substantially identical to one another and predicated on the common contention that they were injured by the transfer of all or part of their pension liabilities to Athene in violation of ERISA. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include:

    i.  Did Bristol-Myers and The Committee breach their fiduciary duties when they selected Athene as the annuity provider?

    ii.  Did State Street breach its fiduciary duty when it assisted Bristol-Myers and The Committee in entering into the transaction?

    iii.  Was the transaction *per se* unlawful under ERISA?

    iv.  Did the analysis performed by Bristol-Myers, The Committee, and State Street that led Bristol-Myers and State Street to select Athene as the annuity provider satisfy those entities' fiduciary obligations?

    v.  Should the Court order injunctive relief that ensures the Class will be able to obtain the value of their retirement benefits?

vi.  Should the Court order Bristol-Myers to disgorge the millions in profit that it secured from breaching its fiduciary duty?

184.    <u>Typicality:</u> Mr. Doherty's claims are typical of the Class's claims. His claims arise from the same conduct, and seek to redress the same legal violations, as the Class's claims.

185.    <u>Adequacy:</u> Mr. Doherty will fairly and adequately protect the interests of the Class. He has no interest antagonistic to those of the other members of the Class. He is committed to the vigorous prosecution of this action. He has retained counsel who specialize in the substantive law of ERISA and pension plans, and who are experienced and competent in the prosecution of large class actions, including those arising under ERISA.

186.    <u>Rule 23(b)(1):</u> The prerequisites for a (b)(1) class are satisfied. Prosecution of separate actions by Class members would risk establishing incompatible standards of conduct for Defendants. Additionally, adjudications as to individual Class members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

187.    <u>Rule 23(b)(2):</u> The prerequisites for a (b)(2) class are satisfied. Defendants' misconduct was generally applicable to the Class. The injunctive relief that Mr. Doherty seeks affects the Class as a whole. Individual Class members do not have an interest in prosecuting their claims in this action individually because Class members' claims are identical and the injunctive relief sought will affect each Class member equally.

188.    <u>Rule 23(b)(3):</u> The prerequisites for a (b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class-wide proof. Class-wide litigation of this action is also superior to individual litigation because there are no difficulties in

managing this case as a class action and there is a strong need to concentrate the Class members' claims in one action.

**COUNT I: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES**
*Against Bristol-Myers, The Committee, and State Street*

189.    The foregoing allegations are incorporated by reference herein.

190.    Bristol-Myers, The Committee, and State Street were, at all relevant times, Plan fiduciaries.

191.    Under 29 U.S.C. § 1104(a)(1), they were thus required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." This duty requires that ERISA plans be operated for the "exclusive benefit" of plan participants, and ERISA relatedly provides that, except in limited circumstances inapplicable here, "the assets of a plan shall never inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1). Bristol-Myers, The Committee, and State Street were also required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

192.    IB 95-1 summarizes the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a "Pension Risk Transfer." Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available" and fiduciaries may never select an unsafe annuity. Fulfilling the duty of prudence requires an objective, thorough, and analytical search for a suitable annuity provider.

193.    Bristol-Myers, The Committee, and State Street breached these fiduciary duties of loyalty and prudence when they selected Athene as the annuity provider to receive Plaintiff's pension liabilities for their own financial advantage.

194.    Athene was neither a safe nor reasonable annuity provider.

195.    Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available, and Bristol-Myers, the Committee, and State Street selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving Bristol-Myers money and enhancing corporate profits. In so doing, Bristol-Myers, The Committee, and State Street breached their duty of prudence by selecting an unsuitable annuity provider and breached their duty of loyalty by favoring their own corporate interests over the participants' interests in a secure retirement. Bristol-Myers' and The Committee's goal was to save Bristol-Myers money and State Street's goal was to further its line of business that recommends Athene as an annuity provider. Consequently, their search and selection of Athene was biased in favor of the lower-cost provider and neither objective nor sufficiently thorough or analytical, thereby breaching their duty of prudence.

196.    The transfer of Plaintiff's pension obligations to Athene has caused Plaintiff injury, namely the substantially and quantifiably decreased value of his pension benefits, which are far less secure as a result of the transaction; increased the substantial risk that Plaintiff will not receive the full retirement benefits to which he is entitled; and the loss of ERISA protections.

197.    Bristol-Myers, The Committee, and State Street are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/costs savings pocketed by purchasing Athene annuities instead of the safest annuity

available, and the posting of security to assure receipt by Plaintiffs and Class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C §§ 1109(a), 1132(a)(2, 1132(a)(3), 1132(a)(9).

198.    In addition to breaching their own fiduciary duties, Bristol-Myers, The Committee, and State Street knowingly participated in each other's fiduciary breaches: they knew each other's acts were a breach of fiduciary duty, enabled the breach, and failed to make any reasonable effort under the circumstances to remedy the breach. They are thus liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

199.    Bristol-Myers and The Committee are also liable for failing to monitor State Street, which it appointed and retained to manage the Plan on a day-to-day basis, including the day-to-day responsibility of selecting service providers, such as annuity providers.  Bristol-Myers and The Committee failed to ensure that the process of selecting Athene as the annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A)–(B) and IB 95-1. Had Bristol-Myers and The Committee fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of a safer annuity provider or Bristol-Myers and the Committee would have decided not to proceed with the transaction.

200.    Bristol-Myers also separately breached its fiduciary duties with respect to The Committee. Bristol-Myers, through the Compensation and Management Development Committee of the Board of Directors, selected and had the power to remove the members of The Committee and as such had the fiduciary duty to monitor The Committee to ensure that it was satisfying its fiduciary duties as Plan administrator. Bristol-Myers failed to do so in breach of its fiduciary duties.

201.    Bristol-Myers and The Committee also breached their fiduciary duty by failing to reasonably monitor State Street—which they had installed as a fiduciary and had the power to remove—and to ensure that State Street was satisfying the fiduciary duties imposed on it by ERISA.

## COUNT II: KNOWING PARTICIPATION IN A FIDUCIARY BREACH RELATED TO AN INSURANCE ANNUITY
*Against Bristol-Myers, The Committee, and State Street for the Selection of Athene*

202.    Paragraphs 1 through 188 are incorporated by reference herein.

203.    Section 1132(a)(9) not only empowers individuals to bring actions when their status as plan participants is terminated by annuitizations that violate ERISA, it also imposes substantive duties on certain nonfiduciaries.

204.    Specifically, it creates liability for nonfiduciaries who knowingly participate in a fiduciary breach in violation of ERISA, 29 U.S.C. § 1104.

205.    Plaintiffs thus allege, in the alternative to Count I, that, even if Bristol-Myers, The Committee, or State Street were a nonfiduciary for the purpose of the annuitization, that entity is liable under Section 1132(a)(9), so long as the other entity is deemed a fiduciary. Among other things, Bristol-Myers, The Committee, and State Street knew of the circumstances that rendered the other's conduct a breach of fiduciary duty and participated in that breach.

206.    Bristol-Myers and The Committee hired State Street for the purpose of selecting an annuity provider, knew that State Street's investigation of available annuity providers was not objective or sufficiently thorough; knew that the deficient selection of Athene instead of a prudent alternative annuity provider would generate a massive corporate benefit for Bristol-Myers; and knowingly accepted that benefit by entering into the annuitization with Athene.

## COUNT III: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES
*Against Bristol-Myers and The Committee for the Selection of State Street*

207.    Paragraphs 1 through 188 are incorporated by reference herein.

208.    ERISA's fiduciary duties apply to the selection of service providers. 29 U.S.C. § 1104(a)(1)(A)–(B).

209.    Bristol-Myers breached its fiduciary duties by selecting State Street as the Plan's "independent fiduciary" for the purposes of the transaction.

210.    Because of State Street's track record of recommending "Pension Risk Transfers" between plan sponsors and Athene, Bristol-Myers had an interest in selecting State Street at the "independent fiduciary" that was not predicated on the best interest of Plan participants.

211.    Bristol-Myers' selection of State Street failed to consider how State Street's relationship with Apollo and Athene would impair its impartiality and judgment in selecting an annuity provider.

212.    Bristol-Myers fiduciary breach in selecting an independent fiduciary facilitated the subsequent selection of Athene, which harmed Plaintiff.

## COUNT IV: PROHIBITED TRANSACTION
*Against Bristol-Myers and The Committee; State Street as party in interest*

213.    Paragraphs 1 through 188 are incorporated by reference herein.

214.    Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

215.    Bristol-Myers and The Committee were at all times fiduciaries to the Plan.

216.    Bristol-Myers and The Committee caused the Plan to engage in the annuity transactions with knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and State Street.

217.    Bristol-Myers and The Committee caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between State Street and the Plan.

218.    When Bristol-Myers and The Committee caused the Plan to engage in the annuity transaction, State Street was a party in interest, including because State Street was a fiduciary of the Plan and a person providing services to the Plan. 29 U.S.C. § 1002(14). Bristol-Myers and The Committee knew of that fact when they caused the Plan to engage in the annuity transaction.

219.    Bristol-Myers and The Committee knowingly participated in the breach of State Street, knowing that such acts were a breach, enabled State Street's commission of a breach by failing to lawfully discharge their fiduciary duties, knew of the breach by State Street, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the loses caused by the breach of their co-fiduciary under 29 U.S.C. § 1105(a), and would be liable even if they were deemed nonfiduciaries.

### COUNT V: PROHIBITED TRANSACTION
*Against Bristol-Myers and The Committee; Athene as party in interest*

220.    Paragraphs 1 through 188 are incorporated by reference herein.

221.    Bristol-Myers and The Committee also caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan and Athene; (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D).

222.    When Bristol-Myers and The Committee caused the Plan to engage in the annuity transaction, Athene was a party in interest, including because Athene was a person providing services to the Plan. 29 U.S.C. § 1002(14). Bristol-Myers and The Committee knew of that fact when they caused the Plan to engage in the annuity transaction.

## COUNT VI: PROHIBITED TRANSACTION
*Against State Street; Bristol-Myers and The Committee as parties in interest*

223.    Paragraphs 1 through 188 are incorporated by reference herein.

224.    State Street was at all relevant times a fiduciary to the Plan.

225.    State Street caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan, on one hand, and Bristol-Myers and The Committee, on the other hand; (ii) furnishing of services between the Plan and Bristol-Myers and The Committee; and (iii) the transfer to, or use by or for the benefit of Bristol-Myers and The Committee, of Plan assets;

226.    When State Street caused the Plan to enter into the annuity transaction, Bristol-Myers and The Committee were parties in interest, including because they were fiduciaries of the Plan and persons providing services to the Plan. 29 U.S.C. § 1002(14). State Street knew of these facts when it caused the Plan to engage in the annuity transaction.

227.    State Street knowingly participated in the breaches of Bristol-Myers and The Committee, knowing that such acts were a breach, enabled breaches by Bristol-Myers and The Committee by failing to lawfully discharge their fiduciary duties, knew of the breach by Bristol-Myers and The Committee, and failed to make any reasonable effort under the circumstances to remedy the breach. It is thus liable for the losses caused by the breach of their co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT VII: PROHIBITED TRANSACTION
*Against State Street; Athene as party in interest*

228.    Paragraphs 1 through 188 are incorporated by reference herein.

229.    State Street also caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan and the Athene, (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets.

230.    When State Street caused the Plan to enter into the annuity transaction, Athene was a party in interest, including because it was a person providing services to the Plan. 29 U.S.C. § 1002(14). State Street knew of this fact when it caused the Plan to engage in the annuity transaction.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Plaintiff prays that judgment be entered against Defendants on all claims and request that the Court:

    i.   Certify the Class under Federal Rule of Civil Procedure 23, appoint Plaintiff Doherty as Class representative and appoint his attorneys as Class counsel to represent the members of the Class;

    ii.   Order the Defendants to guarantee the annuities purchased from Athene through the purchase, at their expense, of appropriate guarantees from reliable insurers selected through appropriate procedures or the posting of an appropriate security;

iii.   Issue an injunction assuring receipt by Class members of the amounts to be provided by the annuities, plus reasonable prejudgment interest on those amounts, 29 U.S.C. § 1132(a)(9);

iv.   Order Bristol-Myers, through Plan amendment or otherwise, to place the GACs it unlawfully purchased inside the Plan as a Plan asset and to return the Class members to their former status as Plan participants;

v.   Order Bristol-Myers to remain secondarily liable for Plaintiff's and the Class's pension benefits;

vi.   Order disgorgement of all sums derived from the unlawful transaction; and/or

vii.   Order any appropriate relief this Court deems just and equitable.

Plaintiff also seeks reasonable attorneys' fees, costs, and pre- and post-judgment interest on any monetary compensation to which he is entitled.


Dated:  September 3, 2024                       _/s/     Edward S. Stone_____
                                                Edward Stone (N.Y. Bar No. 2259489)
                                                Lisa A. Salmons (N.Y. Bar No. 2285336)
                                                EDWARD STONE LAW P.C.
                                                575 Lexington Ave., 14th Floor
                                                New York, NY 10022
                                                (646) 933-3143
                                                (203) 348-8477 (Fax)
                                                Mailing Address: 175 West Putnam Ave., 2nd Fl.
                                                Greenwich, CT 06830
                                                eddie@edwardstonelaw.com


                                                _/s/ Cyril V. Smith_____
                                                Cyril V. Smith (*pro hac vice* forthcoming)
                                                ZUCKERMAN SPAEDER LLP
                                                100 E. Pratt Street, Suite 2440
                                                Baltimore, MD  21202

(410) 949-1145
(410) 659-0436 (Fax)
csmith@zuckerman.com

Bryan M. Reines (*pro hac vice* forthcoming)
ZUCKERMAN SPAEDER LLP
1800 M Street N.W., Suite 10000
Washington, D.C. 20036
(202) 778-1846
(202) 822-8106 (Fax)
breines@zuckerman.com


Elizabeth Hopkins (*pro hac vice* forthcoming)
Susan L. Meter (*pro hac vice* forthcoming)
KANTOR & KANTOR LLP
19839 Nordhoff St.
Northridge, CA 91324
(818) 886-2525
(818) 350-6272 (Fax)
ehopkins@kantorlaw.net
smeter@kantorlaw.net

*Attorneys for Plaintiff and the proposed Class*