**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHARLES DOHERTY and MICHAEL J. NOEL, individually and as representatives on behalf of a class of similarly situated persons,<br><br>      Plaintiffs<br><br>           v.<br><br>BRISTOL-MYERS SQUIBB CO.<br>Route 206 & Province Line Road<br>Princeton, New Jersey 08543,<br><br>BRISTOL-MYERS SQUIBB CO. PENSION COMMITTEE<br>Route 206 & Province Line Road<br>Princeton, New Jersey 08543<br><br>BRISTOL-MYERS SQUIBB COMPENSATION AND MANAGEMENT DEVELOPMENT COMMITTEE<br>Route 206 & Province Line Road<br>Princeton, New Jersey 08543<br><br>-and-<br><br>STATE STREET GLOBAL ADVISORS TRUST CO.<br>1 Iron Street<br>Boston, Massachusetts 02210-1641,<br><br>      Defendants. | Case No. 1:24-cv-06628-MMG<br><br><br><br>JURY TRIAL DEMANDED |

## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

Plaintiffs Charles Doherty and Michael J. Noel, individually and as representatives of a

class of similarly situated persons, sue Defendants Bristol-Myers Squibb, Co. ("Bristol-Myers"),

Bristol-Myers Squibb Company Pension Committee ("The Pension Committee"), Bristol-Myers

Squibb Compensation and Management Development Committee of the Board of Directors ("The

Management Committee"), collectively the "Bristol-Myers Defendants," as well as State Street Global Advisors Trust Co. ("State Street"), for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* Plaintiffs complain and allege as follows.

## NATURE OF THE CASE

1.      This case is about one of America's largest and oldest pharmaceutical companies, Bristol-Myers—which traces its lineage to the 19th Century—losing its way and turning its back on its retired workers by placing the pensions of thousands of its retirees in peril to secure itself an enormous profit. Although Bristol-Myers is worth more than $100 billion, the company decided to fatten its wallet by placing its retirees' futures in the hands of a risky new insurance company that is dependent on its Bermuda-based subsidiary. Bristol-Myers' plan was assisted by State Street, itself the offshoot of a financial institution of long standing. Bristol-Myers stood to gain—and did gain—millions of dollars from this scheme, and State Street profited handsomely as well. The only losers in the transaction were Bristol-Myers' retirees, who face the danger—now and in the future—that their lifetime pensions will go unpaid while they have lost all the protections of federal law. Plaintiffs Doherty and Noel seek to right this wrong, and to restore Bristol-Myers' pensioners to their rightful places of financial security by recouping Bristol-Myers' and State Street's ill-gotten gains and otherwise ensuring the safety of their retirements and the retirement benefits of thousands of others.

## BACKGROUND

2.      Bristol-Myers sponsored and operated, and The Pension Committee administered, the Bristol-Myers Squibb Retirement Income Plan (the "Plan"). The Plan was a defined benefit plan protected by ERISA.

2

3.      In 2019, as part of a scheme to terminate the Plan, seize Plan assets for itself, and avoid the costs associated with continued sponsorship of the Plan, Bristol-Myers offloaded $2.6 billion worth of pension liabilities—retirement money it had promised to pay thousands of Plan participants and beneficiaries—to Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York, subsidiaries of Athene Holding Ltd. (collectively, "Athene"). In doing so, it removed those Plan participants and former employees from the Plan, placed their retirement benefits beyond ERISA's protections, and terminated the Plan.

4.      As a consequence, Bristol-Myers enjoyed millions of dollars of economic gain.

5.      Bristol-Myers accomplished this result by purchasing "group annuity contracts" from Athene under which Bristol-Myers paid Plan assets to Athene in exchange for Athene assuming the obligation to pay the Plan's participants and beneficiaries their retirement benefits through an insurance policy outside of ERISA's protective regime.

6.      Put simply, to improve its own financial position, Bristol-Myers used Plan assets to pay Athene in exchange for Athene agreeing to pay the retirees' benefits as they come due.

7.      Pension industry insiders refer to such group annuity transactions as "annuitizations," "de-risking," or "Pension Risk Transfers."

8.      But although Bristol-Myers' transaction with Athene was a "de-risking" from Bristol-Myer's perspective, in truth it was a massive risk transfer *from* Bristol-Myers *to* Plan participants and beneficiaries, designed to secure millions for Bristol-Myers.

9.      Before the annuitization, Plan pension benefits were guaranteed by Bristol-Myers, which was responsible for funding a trust from which to pay pensions and which was obliged to pay the benefits as they came due, even if Plan investments fell short of expectations. Bristol-Myers was also obliged by ERISA's funding requirements to protect the Plan's financial health by

3

making additional contributions to the Plan when necessary. And the benefits were further assured by the Pension Benefit Guaranty Corporation ("PBGC"), the federal agency charged with insuring pension benefits, because Bristol-Myers funded and the Plan paid premiums to the PBGC for retirees.

10.     After the annuitization, none of this is true. Bristol-Myers no longer guarantees payment of the retirement benefits. Bristol-Myers is no longer subject to ERISA's funding requirements as to these liabilities. The annuitized individuals are no longer Plan participants covered by ERISA's many protections; they have been ejected from the federal pension regime, so the PBGC no longer provides a backstop to ensure that they receive their retirement benefits. And Bristol-Myers need not pay PBGC premiums associated with the retirees.

11.     The annuitized Plan participants and beneficiaries must now rely entirely on the solvency of Athene for their retirement benefits.

12.     But Athene was not at the time of the annuitization, and is not today, an entity to be trusted with the retirement income of many thousands of Americans. At that time it was, and today it remains, a highly risky annuity provider.

13.     Athene is one of a new class of insurers (the "Risk-Taking Insurers") engaged in the dicey "shadow banking" sector.

14.     As compared to its competitors, Athene can offer cheaper annuities to plan sponsors looking to offload their pension obligations because it invests in in lower-quality, higher-risk assets. That investment strategy allows Athene to generate higher expected returns and profits for itself and its affiliates in the short term but threatens its ability to pay the benefits it owes to retirees.

15.     Whatever place insurers like Athene have in the financial system, that place is not the American retirement sector given Athene's high-risk, low transparency strategies.

16.     Despite the risk posed by entrusting the pension benefits to Athene, Defendants selected Athene as the annuity provider because Athene's annuities are cheaper than the safer alternatives provided by traditional insurers.

17.     The Plan participants and beneficiaries whom Bristol-Myers unloaded to Athene bear all of the transaction's risk while enjoying none of the profits that Bristol-Myers reaped through its purchase of a much less expensive, but far riskier, annuity than was available and that Bristol-Myers could have purchased to secure the pension benefits of Plan participants.

18.     Through the annuitization, Bristol-Myers captured hundreds of millions of dollars in surplus Plan assets that reverted back to Bristol-Myers and that Bristol-Myers then used to its own corporate ends.

19.     Before the annuitization, those Plan assets were held in trust for the exclusive purpose of paying defined-benefit pensions to retirees and defraying reasonable Plan expenses.

20.     But instead of using Plan assets to protect retirees by paying Plan benefits and expenses as they came due, Bristol-Myers converted those assets for its own corporate purposes at the expense of the retirees it was obligated to protect.

21.     Thus, the upside of the transaction was enjoyed by Bristol-Myers, which made millions; by State Street, a fiduciary of the Plan which was paid to recommend and bless the transaction; and by Athene, which was paid to assume the liabilities and is now gambling with retirees' livelihoods.

22.     Plan sponsors are not flatly prohibited by law from transferring pension obligations to insurance companies through annuitizations.

23.     But Congress has, through ERISA, imposed obligations upon plan sponsors, administrators, and others to regulate their ability to transfer workers' benefits from the federally regulated pension system to private annuity providers.

24.     Specifically, ERISA requires that fiduciaries satisfy exacting fiduciary standards— indeed, *the highest known to law*—when selecting annuity providers for such transactions. *See* 29 U.S.C. § 1104 (mandating that fiduciaries act with the "care, skill, prudence, and diligence" that a prudent person would exercise in like circumstances and "solely in the interests of the participants and beneficiaries"); *see also* 29 C.F.R. § 2509.95-1 ("IB 95-1") (explaining that the fiduciary duty imposed by ERISA requires fiduciaries to select the "safest annuity available" and that "purchasing an unsafe annuity" is "never justif[ied]").

25.     And ERISA flatly prohibits certain self-dealing and other transactions that are likely to be abusive. *See* 29 U.S.C. § 1106.

26.     Such fiduciary duties and prohibitions are particularly important when the annuitization is part of a scheme to terminate the plan and when plan assets revert to the plan sponsor so that it can use the money for its own ends.

27.     Bristol-Myers' transaction with Athene did not satisfy these exacting standards.

28.     To satisfy ERISA's fiduciary duties, the Bristol-Myers Defendants and State Street were obliged to act solely in the Plan participants' best interests and to select a safe and reasonable annuity provider.

29.     But Defendants did not select Athene because it was the best or safest annuity provider for Plan participants; rather, they selected Athene because it was cheaper and thus offered greater financial savings and gains *for Bristol-Myers* than safer, traditional annuity providers that

6

have a proven record of the financial strength necessary to shoulder such large and important obligations over a period of many decades.

30.    Defendants, all of whom are fiduciaries, have thus breached their fiduciary duties under ERISA, and the transaction was prohibited by ERISA.

31.    Plaintiffs Doherty and Noel bring this action, individually and on behalf of the retirees annuitized by Bristol-Myers in 2019—participants and beneficiaries whose pensions are no longer guaranteed by Bristol-Myers or afforded the protections of ERISA—to remedy those violations.

32.    The pensions of these individuals were a guaranteed lifetime income meant to support them through the later years of their lives and to compensate them for decades of faithful service.

33.    But Plan participants had no say in which insurer would be selected as their annuity provider, and those annuitized cannot select a different annuity provider to be responsible for payment of their retirement benefits.

34.    Bristol-Myers and State Street have profited at the Plan participants' expense to the tune of many millions of dollars. At the same time, Defendants' fiduciary breaches have caused Plaintiffs and the proposed class massive financial injury: because their retirement benefits are now no longer guaranteed by the Plan or Bristol-Myers, covered by ERISA, or protected by the PBGC—and instead depend on Athene's solvency—the present value of those benefits has substantially and quantifiably diminished, and there is a substantial risk that Plaintiffs will not receive their full retirement benefits.

35.    Plaintiffs were not compensated in any way for that loss of value and increased risk.

36.     Plaintiffs seek injunctive relief requiring Bristol-Myers to guarantee the retirement benefits that were part of workers' employment bargain with Bristol-Myers and which those workers earned through their service to Bristol-Myers, including the injunctive relief expressly provided by ERISA for annuitization-related fiduciary breaches, 29 U.S.C. 1132(a)(9) (empowering plaintiffs in such cases to "obtain appropriate relief, including the posting of security if necessary, to assure receipt . . . of the amounts provided or to be provided" by the annuities).

37.     Plaintiffs also seek disgorgement and monetary relief from Bristol-Myers and State Street including the profit those entities earned from the unlawful transaction and the losses resulting from their illegal conduct. *Id.*

## PARTIES

38.     Plaintiff Charles Doherty was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7) at all relevant times. He resides in Pleasantville, New York, and he worked for Bristol-Myers in a series of positions from 1986 until 2000. He earned retirement benefits which, because of the Athene transaction at issue, are now in the form of a lifetime monthly annuity backed only by Athene. He has counted on receiving his pension benefits from Bristol-Myers throughout his retirement. Before his pension benefits were annuitized, he knew they were safeguarded because Bristol-Myers stood behind them. That is no longer the case.

39.     Plaintiff Michael J. Noel was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7) at all relevant times. He resides in Petaluma, California. In 1984, he began working for DuPont Pharmaceuticals Company, which was acquired by Bristol-Myers in 2001. He then worked for Bristol-Myers until his retirement in 2019. His decades of service entitled him to lifetime pension benefits from Bristol-Myers, all of which have been offloaded to Athene.

40.     Bristol-Myers is a publicly traded, multinational pharmaceutical company with a market capitalization exceeding $100 billion. It is one of the largest pharmaceutical companies in the world. It was the Plan's sponsor and one of its fiduciaries with respect to the transaction with Athene because it selected State Street to assist it in offloading liabilities through group annuity contracts; approved the selection of Athene as the annuity provider; elected to enter into the transaction with Athene; agreed to purchase the group annuity contracts; and exercised control over Plan assets through the transfer of billions of dollars' worth of liabilities.

41.     The Management Committee was created by, and acts on behalf of, Bristol-Myers' Board of Directors. It exercised discretionary authority and responsibility over the Plan, including by appointing, monitoring, and overseeing The Pension Committee, which facilitated the Athene transaction.

42.     The Pension Committee is the Plan's administrator. Its members were appointed, overseen, and monitored by The Management Committee. The Pension Committee is responsible for the general administration of the Plan and is one of the Plan's named fiduciaries. The Pension Committee had the authority to manage and control Plan assets, including the ability to appoint and remove trustees, investment managers, and other investment-related service providers, to enter into agreements, and to determine the Plan's investment strategy.

43.     State Street is a company formed to facilitate State Street Bank and Trust Company's asset management business and State Street Global Advisors' U.S. institutional investment management business. It was at all relevant times a Plan fiduciary with respect to the annuity transactions at issue, including because it exercised discretionary authority and control over Plan assets when it helped Bristol-Myers enter into the annuity transaction, played a role in

9

selecting Athene as the annuity provider, and cast itself as an "independent fiduciary" to the Plan for the purpose of the annuity transactions.

## **JURISDICTION AND VENUE**

44.     Subject-matter Jurisdiction. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under ERISA, 29 U.S.C. §§ 1001, *et seq.*

45.     Standing. This matter is a "case" or "controversy" within the meaning of Article III of the United States Constitution. Plaintiffs have suffered injuries-in-fact traceable to Defendants' conduct that could be redressed by a decision from this Court.

46.     Specifically, Plaintiffs have been injured by having their accrued pension benefits and future retirement benefits offloaded, from an ERISA-governed pension plan backed by an established multibillion-dollar corporation and the PBGC, to a private equity-controlled insurance company with a highly complex and opaque Bermuda-based structure and risky asset portfolio. The annuitization quantifiably and substantially impaired the value of Plaintiffs' retirement benefits the moment it occurred.

47.     The annuitization also exposed Plaintiffs to a substantial risk that their pension benefits will not be paid, and it substantially increased the risk of nonpayment. Plaintiffs, as well as any rational investor, would demand compensation for undertaking such increased risk. But Plaintiffs were not compensated for the annuitization.

48.     Plaintiffs also have standing because Defendants' breaches of fiduciary duties caused them to suffer intangible yet concrete injuries—namely, the invasion of legally protected interests—that were actionable at common law.

49.     Personal Jurisdiction. The Court has personal jurisdiction over each Defendant. 29 U.S.C. § 1132(e)(2).

50.    When the transaction took place, Bristol-Myers' principal executive offices were at 430 E. 29th Street, New York, New York 10016. Bristol-Myers has purposefully availed itself of the privilege of conducting business in this State, by conducting substantial business in New York, including business related to the Plan. Upon information and belief, Bristol-Myers took actions in New York that give rise to Plaintiffs' claims, namely electing to terminate the Plan and enter into the group annuity transactions with Athene. At the time of the annuitization and since, Bristol-Myers has had substantial business contacts with the United States, generally, and New York, specifically.

51.    The Pension Committee and The Management Committees were arms of Bristol-Myers. The Pension Committee was at all relevant times based in New York, and its purpose was to administer the Plan, which was also based in New York.

52.    State Street has minimum contacts with the United States, in general, and New York, in particular. State Street's corporate relatives conduct substantial business in New York, and, upon information and belief, certain actions taken by State Street with respect to Bristol-Myers's decision to enter into the annuity transaction with Athene occurred in New York. State Street chose to advise Bristol-Myers, which was at the time headquartered in New York, to enter into the annuity transactions. It would be neither unfair nor unreasonable for Defendants to face this suit in New York.

53.    <u>Venue.</u> Venue is proper under 29 U.S.C. § 1132(e)(2). The Plan was located in this District when the breach took place; the breach occurred in this District, where Mr. Doherty resides; and Defendants may be found in this District.

## ERISA'S FIDUCIARY STANDARDS

54.     ERISA's primary purpose, evidenced by its plain text, is to protect the retirement security of plan participants and their beneficiaries. The statute achieves its protective purposes by imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably duties of loyalty and prudence. 29 U.S.C. § 1104(a). That section states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the plan participants and beneficiaries—and
>
> > (A) for the exclusive purpose of
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan; [and]
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

55.     Because the selection of an annuity provider involves the exercise of discretion and implicates fiduciary duties, the Department of Labor has issued regulatory guidance known as IB 95-1 that describes the legal standard imposed by § 1104(a)(1)(A) and (B), as those provisions relate to a fiduciary's selection of an annuity provider in connection with a Pension Risk Transfer. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available," and it is never permissible to "purchas[e] an unsafe annuity."

*Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for a safe annuity provider.

56.    The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered *per se* violations of ERISA because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include entities that a fiduciary may be inclined to favor at the expense of plan beneficiaries. 29 U.S.C § 1106(a)–(b); 29 U.S.C. § 1002(14).

## FACTS APPLICABLE TO ALL COUNTS

### *Background on the Transfer of Pension Benefit Responsibilities to Insurance Companies*

57.    In a defined benefit pension plan, the plan sponsor (typically the employer) agrees to pay monthly pension benefits to retirees as they come due for the rest of the participants' lives, and it funds those benefits through assets—contributed both initially and over time by the employer—that are invested and held in trust for plan participants.

58.    The employer must pay the pension benefits, even if investment performance falls short of expectations.

59.    The employer must also make additional contributions to the Plan in accordance with ERISA's funding requirements, which demand additional plan contributions in certain circumstances, including if investment returns fall short of expectations and are insufficient to satisfy obligations to plan participants. Thus, the investment risk—the possibility that the plan's investments will generate insufficient returns to cover the plan's pension obligations and the expenses of operating the plan—is borne entirely by the plan sponsor.

60.     If the sponsor goes bankrupt or otherwise lacks the resources to continue to fund the plan and pay required benefits, the PBGC steps in as a backstop to pay benefits due.

61.     These features of defined benefit plans make them both valuable and predictable for retirees. Such plans once dominated the American retirement system because they were correctly seen as a way to attract and retain the best workforce.

62.     But because these plans are so valuable to employees, they are conversely expensive for employers. Consequently, defined *contribution* plans control the retirement plan scene today. In a defined contribution plan, the employees' benefit is limited to the value of an individual investment account, meaning that the employee bears the risk of investment underperformance.

63.     And the defined benefit plans that do exist are, given their expense to employers, being hunted to extinction, even in circumstances where (as here) the sponsoring company is greatly profitable and far from insolvency. As part of a recent trend by employers that sponsor defined benefit plans to improve their bottom lines, numerous sponsors have chosen to shift their responsibility to pay monthly pensions to insurance companies, by purchasing group annuity contracts.

64.     The upside of such transactions—enjoyed by plan sponsors—is increased profits; the downside—borne by plan participants—is the increased risk of losing promised retirement benefits because the annuity provider is unable to perform, and the benefits are no longer guaranteed by their former employer and the PBGC. As alleged further below, the risk of insolvency by the annuity provider is not hypothetical but real.

65.     Participants lose valuable protections under ERISA when their employer transfers its pension obligations to an annuity provider. ERISA-governed defined benefit plans are protected

14

by the PBGC. When employers annuitize pension benefits, affected pensioners lose both their ERISA and their PBGC protections.

66.     And although the PBGC is not explicitly backed by the full faith and credit of the federal government, it is commonly understood that, as a practical matter, this is nonetheless the case because, in the event of the PBGC's financial insolvency, Congress would face overwhelming pressure to bail out the agency to rescue pension beneficiaries from massive losses of their accrued benefits.

67.     Participants of pension plans who have been booted from ERISA's protective regime by group annuity transactions lose the right to recover from the PBGC, and the only even theoretical backstop for their pension benefits are state guaranty associations ("SGAs").

68.     But SGAs are no substitute for the PBGC, and they offer substantially less protection than the PBGC.

69.     The members of SGAs are insurance companies, and the associations are supposed to protect insurance policyholders generally in the event that their insurer defaults. SGAs are— unlike the PBGC—not pre-funded; they are funded by assessments imposed on member insurers once another insurer is declared insolvent. SGAs' payments to policyholders are also substantially capped by state law. In most states, that cap is so low that pensioners with the right to receive their retirement benefits for many decades (from their retirement until their death) could exhaust their allotments within mere years. And in some states, including California, annuitants automatically lose 20% of their benefits when their insurer becomes insolvent.

*Congress Has Outlawed Risky Annuitizations and Empowered Plan Participants to Sue to Protect Their Present and Future Benefits.*

70.    Annuitizations have become an increasingly common way for employers to diminish their defined benefit liabilities (and to profit from such transactions) or to dispense with defined benefit plans altogether.

71.    But they are not new.

72.    In the 1980s, hundreds of employers terminated their well-funded, federally insured defined benefit pension plans and bought retirement annuities from a variety of insurance companies, including Executive Life Insurance Company ("Executive Life"), which was then one of the country's largest insurers, but which had embarked on a disastrous "junk bond" investment strategy.

73.    The pension benefits of approximately 84,000 workers and retirees were transferred from the federally regulated pension system to Executive Life.

74.    Executive Life was often selected by employers because it offered the lowest bid on group annuity contracts. Rather than choose a safer, more expensive annuity, employers placed their own financial interests over plan participants' needs. Executive Life was able to undercut its competitors because of its high-risk investment practices.

75.    Those decisions to select Executive Life for annuitizations proved disastrous when, in 1991, Executive Life became insolvent. A significant portion of its assets had been invested in high-risk, high-yield junk bonds procured through the Drexel Burnham Lambert ("Drexel") investment bank, which then failed due to its risky bond strategy.

76.    The failure of Drexel led to Executive Life defaulting on its annuity contracts, thereby failing to make good on its obligations to tens of thousands of pension annuitants. State regulators were required to seize the company in April 1991 to prevent a run. The debacle resulted

16

in massive losses to pensioners, with policyholder losses estimated at $3.9 billion in 1991 (equivalent to $9.1 billion in 2024).

77.    Just before Executive Life's implosion it had been one of the nation's largest insurers and had been given an "A+" credit rating. Up until a week before it was seized by regulators, and just a few weeks before its parent company sought bankruptcy protections, it maintained a "contingent B+" rating.

78.    Executive Life had thus obscured the true riskiness of its bond portfolio, and hundreds of thousands of pensioners lost the vested financial security in retirement that their former employers had promised them for their decades of service. Many lost 50% or more of their annuity payments.

79.    According to a statement by the United States General Accounting Office ("GAO"), reckless growth and investment in high-risk assets were driving factors in the failures of Executive Life and other insurers who failed around the same time. In fact, the same report found that the assets of the failed insurers grew at a rate six to ten times faster than the life insurance industry's overall asset growth rate, which is present here with Athene. Sales of high-risk investment products contributed in part to this rapid growth. A mere 8.3% to 11.7% loss resulting from the insurers' high-risk investments would be enough to eliminate their surplus and reserves. According to the GAO, the insurers artificially inflated their surplus through a heavy reliance on reinsurance transactions, which is also true for Athene. In the case of Executive Life, it would have been declared insolvent as early as 1983—eight years earlier—if not for its excessive use of reinsurance and borrowed surplus. Ultimately, the declining surpluses of Executive Life and the other insurers, coupled with their rapid growth, led to their insolvency.

80.     Members of Congress were outraged by Executive Life's implosion and its impact on retirees. In response, they enacted the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401 (Oct. 22, 1993) ("PAPA"), as an amendment to ERISA, to prevent similar crises and ensure that plan participants would have legal recourse against risky pension transfers by plan fiduciaries.

81.     Since its enactment in 1974, ERISA had imposed fiduciary duties on plan sponsors that prohibited their undertaking annuitizations with unsafe annuity providers. *See* 29 U.S.C. § 1104.

82.     But PAPA amended ERISA to provide expressly that plan participants and beneficiaries ejected from the federal pension regulatory system by a plan sponsor's purchase of annuities may sue for relief to, *inter alia*, assure the receipt of the benefits to which they are entitled today and in the future. 29 U.S.C. § 1132(a)(9).

83.     And in 1995, the Department of Labor issued IB 95-1, which—like PAPA—aimed to prevent the irresponsible transfer of pension liabilities to insurance companies that are not sufficiently secure to guarantee retirement benefits, a principal animating force behind the enactment of PAPA and indeed ERISA itself. IB 95-1 has since been updated consistent with that purpose.

84.     IB 95-1 provides courts, regulated entities, and the public with the Department of Labor's expert guidance on the fiduciary standards that apply under ERISA to the selection of an annuity provider when a fiduciary transfers defined-benefit pension liabilities to an annuity provider. *See* IB 95-1(a).

85.     It explains that selecting an annuity provider is a fiduciary decision under ERISA, 29 U.S.C. § 1104(a), and that employers therefore must act solely in the interest of the plan's

18

participants and beneficiaries and in accordance with ERISA's strict prudence standard when selecting an annuity provider. IB 95-1(b) (citing 29 U.S.C. § 1104(a)).

86. Thus, to meet their loyalty and prudence obligations in selecting an annuity provider, fiduciaries must "take steps calculated to obtain the safest annuity available, unless the interests of the participants and beneficiaries demand otherwise." Fiduciaries must also, at a minimum, "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities." IB 95-1(c).

87. In performing that analysis, plan fiduciaries must consider, among other things:

    i. the quality and diversification of the annuity provider's investment portfolio;

    ii. the size of the insurer relative to the proposed contract;

    iii. the level of the insurer's capital and surplus;

    iv. the lines of business of the annuity provider and other indications of an insurer's exposure to liability;

    v. the structure of the annuity contract and guarantees supporting the annuities, such as the use of separate accounts;

    vi. the availability of additional protection through state guaranty associations and the extent of their guarantees.

88. In addition, IB 95-1(d) makes clear that a fiduciary violates its duty to act in the best interest of plan participants and beneficiaries if it purchases a riskier, lower-priced annuity to maximize a reversion for the benefit of the plan sponsor.

89. Put simply, "cost or other considerations [can] never justify putting the benefits of annuitized participants and beneficiaries at risk by purchasing an unsafe annuity." IB 95-1(d).

19

*The Private-Equity Backed, Risk-Taking Insurers*

90.     Since Executive Life's collapse, the Pension Risk Transfer market had been dominated by traditional annuity providers, including household names such as MassMutual and New York Life. But more recently a new class of annuity providers has entered the market. These are the "Risk-Taking Insurers."

91.     Private equity firms began purchasing insurance companies primarily to finance their operations. And today private equity firms have substantial influence over the annuity insurance industry, owning life insurers while also serving as their asset managers. As of 2023, private equity firms had spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015.

92.     These firms use complex investment strategies that have led to the greater prominence of illiquid and volatile assets in the insurers' portfolios, which stands in stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies. These highly risky investment strategies permit private-equity owners of life insurers to boast higher returns, in the short-term, than traditional life insurers, which in turn allows them to offer Pension Risk Transfer bids that undercut their competitors (traditional life insurers), and which are attractive to employers looking to offload obligations.

93.     These new Risk-Taking Insurers are more likely than traditional annuity providers to become insolvent now and in the future. Many (i) have not been tested through a full economic cycle and have never weathered a recession; (ii) reinsure annuities with offshore insurance companies that are not required to set aside as much capital as the traditional U.S.-based insurance companies; and/or (iii) invest in assets that are riskier, less liquid and more opaque than those invested in by traditional providers, such as collateralized loan obligations ("CLOs"), asset-backed

securities, private fixed-income placements, subordinated debt, and even the stock of affiliated companies.

94.     The mission of private equity does not align with the best interests of policyholders. Not only do private equity firms receive cash from premiums that can be invested into their other affiliated businesses, but they can also generate significant investment management fees for themselves. Because private equity firms focus on maximizing their immediate financial returns, their entry into the insurance business is dangerous: a chief aim of the insurance business is ensuring that promised retirement benefits are there at the end of the day for policyholders, and failure on that front is disastrous.

95.     Independent industry experts, scholars, and journalists have sounded the alarm that these new Risk-Taking Insurers are unstable and even threaten the wider financial system.

96.     Three economists at the Board of Governors of the Federal Reserve System have recounted how some insurers have, since 2009, developed "a new shadow banking business model that resembles investment banking in the run up to the 2007–09 financial crisis. These life insurers profit by lending to highly-leveraged firms. In particular, they originate risky loans, hold them, and securitize them in [collateralized loan obligations]." By extending credit to "risky projects," these insurers "earn a sizeable spread over the cost of their fixed-annuity liabilities." The paper "show[s] that these life insurance companies hold some of the riskiest portions of the CLOs issued by their own affiliate asset managers against virtually no capital." It also shows that "[t]he shadow banking business of life insurers exponentially increases the industry's vulnerability to aggregate corporate-sector shocks." In short, certain insurers have, since the 2008 financial crisis, "filled a void left by banks in risky corporate loan markets." In doing so, they have "create[d] and become

vulnerable to run risk," the likelihood that such insurers could see their assets shrink quickly and irreversibly when markets turn down.

97.    The paper identifies Athene as an example of an insurer with a shadow banking business.

### *Athene: A Paradigmatic Example of a Risk-Taking Insurer*

98.    Athene is, in fact, an extreme example of a Risk-Taking Insurer. It is owned by the private equity giant Apollo Global Management ("Apollo"), which was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered bankruptcy (and thereby caused the collapse of Executive Life). Leon Black was not only the co-head of Drexel during Executive Life's junk bond binge, but also the financier who purchased Executive Life's discounted assets after its implosion.

99.    Apollo has found a way to make money off the retirement savings of millions of everyday Americans by buying out corporate retirement obligations cheaply and then backing up their resulting annuity obligations through collateralized loans and other risky assets.

100.    Apollo's relationship with Athene is longstanding. Athene Annuity and Life Company was founded in 2009 by Apollo executives as an insurance affiliate. Athene was an important part of Apollo's investment portfolio before 2019, and in October 2019 Apollo nearly doubled its interest in Athene to 35%, while Athene purchased a significant equity stake in Apollo.

101.    In 2021, Apollo announced its merger with Athene and, at the time, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo. Today, approximately 20% of Athene's portfolio is invested in risky asset-backed securities and leveraged loans made to highly indebted companies, and approximately 80% of its Pension Risk Transfer liabilities are

22

reinsured through Bermuda-based affiliates owned by Apollo. Apollo collects asset management fees on all of the investments that it manages for Athene.

102.    Athene and Apollo's interdependence is a cause for serious concern. A top ratings agency recently reported that nearly *25%* of Apollo-owned companies have defaulted since 2022. The failures of these companies were exacerbated by an increase in interest rates. Private-equity owned companies, such as those owned by Apollo, carry increased debt and have lower credit ratings than non-private equity-owned companies, causing them to default at a higher rate. Between January 2022 and August 2024, private equity-owned companies defaulted at a rate of 17%. This is double the default rate of non-private equity-owned companies. And since the end of 2020, two-thirds of all corporate defaults have come from private equity-backed firms.

***Athene's Complex and Risky Offshore Practices Threaten Pensioners.***

103.    Athene and Apollo pioneered much of the risky conduct characteristic of the Risk-Taking Insurers.

104.    Athene is a prime example of an insurer that has grown its shadow banking business by assuming an organizational structure that allows it to engage in risky conduct with former pension plan assets.

105.    As with other insurers engaging in such shadow banking, a central feature of Athene's organizational structure is the location of its affiliated reinsurers (the entities that actually back, or insure, insurers' obligations to policyholders, including pernsioners): Athene Life Re Ltd. and Athene Annuity Re Ltd. are both are headquartered in Hamilton, Bermuda to take advantage of Bermuda's favorable (more lax) regulatory regime.

106. From 2018 to the present, these affiliated reinsurers have allowed Athene to capture market share using the location of their reinsurers in Bermuda, and the lower taxation and more lax oversight that entails, to leverage lower pricing compared to traditional annuity providers.

107. Athene's use of complex investment structures under lax regulatory standards has contributed to its higher risk as an annuity provider.

108. In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero. For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and CLOs, even though some CLOs have greater downside risk than bonds with the same credit rating. The Federal Reserve Board economists referenced above conclude that insurance companies like Athene hold some of the riskiest portions of the CLOs issued by their own affiliated asset managers. Athene has a higher-than-average investment in CLOs since 2018. As of September 30, 2023, approximately 35% of its $20.6 billion of CLOs was in one prominent market reporter's unfavorable BBB category, a higher concentration than that of most other U.S. life insurers.

109. The reinsurance of "Pension Risk Transfer" liabilities in Bermuda poses unique risks to pensioners. Bermuda reinsurers report under Bermuda accounting standards rather than United States Statutory Accounting Principles ("U.S. SAP"), which is the required reporting regime for all U.S.-based insurance companies. Under U.S. SAP, insurers must file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed-income investments, U.S.-based insurers report all individual stock and bond purchases and sales, including CUSIP numbers, which are unique identifiers assigned to stocks and registered bonds. By contrast, under Bermuda standards, Athene's affiliated reinsurers report only in the aggregate

with no individual stock and bond level purchase or sale information. Further, Bermuda standards allow for investments in assets that would not qualify as suitable under U.S. SAP.

110.    The lack of transparency in the reporting by Athene's Bermuda reinsurers is stark. To illustrate, Athene's current statutory financial statements for its principal U.S. insurer (Athene Annuity and Life Company) is 3,939 pages long, whereas the Athene Bermuda entities' consolidated report filed under Bermuda standards is 59 pages long.

111.    Athene's excessive reliance on affiliated offshore reinsurance today is dangerous for those whose retirement benefits are affected by Pension Risk Transfers for numerous reasons. Whereas arm's-length reinsurance, with pricing set by the marketplace, can improve policyholder security by diversifying and sharing fully transparent risk with strong, independent financial partners, reinsurance with a commonly-owned affiliate allows for self-dealing, as pricing is not set by the marketplace. This risk is exacerbated when the affiliated reinsurer is located in an offshore jurisdiction with more lax standards, which leaves the reinsurer's management free to do virtually anything with the extra funds. As a result, captive reinsurance allows insurers to gain multiple advantages, including the ability to price annuities lower than other competitors but at greater risk to the annuitants. That is the case for Athene because both it and its reinsurer are today owned by Apollo.

112.    Moody's recently found that the movement of reinsurance offshore is a "credit negative" for the life insurance sector as a whole. A state insurance regulator in Minnesota, who is also an NAIC actuary, voiced concerns with offshore reinsurance because compared to reserves regulated by U.S. SAP, offshore reserves can be substantially lower, disappear entirely, or in the worst cases, even drop into negative territory. According to the assistant commissioner of New Jersey's Office of Solvency Regulation, reductions in policyholder protections may be due to the

increased use of offshore reinsurance. He also stated that the significant recent increases in the use of offshore reinsurance are in large part due to the ability that offshore reinsurance provides life insurers to greatly reduce their reserves. When states conduct periodic examinations of insurance companies, these examinations do not even consider offshore reinsurers that are often under-reserved.

113.    Life insurance and annuity companies are required to maintain surpluses to ensure long-term solvency, but those with affiliated offshore reinsurers back their liabilities with assets that would not be "admitted" (that is, accepted) by insurance company examiners in their own domiciles. In other words, reinsuring liabilities with affiliated reinsurers—the practice followed by Athene—frees up excess capital for profit generation, or stockholder dividends, but does not decrease risk.

114.    Industry professionals recognize that there are four prevalent factors in the insurance industry that are assessed to evaluate the risk profile of an annuity provider. These factors include: (i) adequate surplus relative the carrier's size and risk profile; (ii) the magnitude of the carrier's use of affiliated reinsurance relative to surplus maintained by the carrier; (iii) excessive growth rates of liabilities relative to surplus; and (iv) the magnitude of higher-risk, less-liquid investments held in the portfolio relative to the surplus maintained by the carrier. The first two factors are recognized as driving factors leading to an insurer's insolvency.

115.    The amount of an insurer's surplus is critically important. It measures an insurer's total assets minus its liabilities. The surplus to liabilities ratio indicates an insurer's ability to pay claims from policyholders because it is the only buffer between an insurer's solvency and default during economic downturns. The measure is calculated by dividing an insurer's surplus by its liabilities. Athene's surplus-to-liability ratio is only 1.44%.

116.    As of year-end 2023, in contrast, a traditional insurer, New York Life, maintained a surplus-to-liability ratio of 12.24%. New York Life, in particular, is a relevant comparison because both insurers have approximately the same amount of total liabilities. As of December 31, 2023, Athene Iowa had $199.1 billion in total liabilities, and New York Life had $206.6 billion. Other peer insurers have held sizable surpluses relative to Athene: Teachers Insurance & Annuity Association ("TIAA") (13.83%) and Nationwide Life Insurance Company ("Nationwide Life") (6.77%). The national average is over 7%.

117.    Athene carries among the thinnest surpluses, as compared to other insurance carriers, as of December 31, 2023. Of the 695 active insurance carriers (*i.e.,* those active carriers reporting liabilities), Athene's surplus-to-liabilities ratio ranked 689th. Just five carriers had a worse ratio than Athene. When focusing on the largest insurance carriers with $100 billion in liabilities, Athene ranked 21 of 22. Again, just one carrier had a worse ratio than Athene. As shown, Athene's surplus-to-liabilities ratio is staggeringly low when compared to that of its peer insurers and, as such, annuitants whose pensions have been transferred to Athene are at a significantly heightened level of risk compared to the level of risk that they would have assumed had their pensions been transferred to a safer insurer.

118.    If an insurer's assets are written down, or its liabilities are written up, the amount of surplus will be reduced accordingly. And the likelihood of this occurring is increased when an insurer holds riskier assets.

119.    In fact, Athene's 2024 second-quarter profit fell 11% from just one year ago due to a drop in income from alternative investments related to Apollo and the roll-off of annuity business, written during the peak of the pandemic, according to Life Annuity Specialist.

27

120.    Athene has maintained one of the smallest surplus levels among life insurance and annuity carriers. New York Life's surplus-to-liabilities ratio, for example, is far higher than Athene's. To illustrate, Athene's total liabilities increased more than 250% from 2018 to 2023, but the amount of surplus maintained to support Athene's liabilities has not increased at the same pace. The growth rate of Athene's liabilities has significantly surpassed the national average growth rate in the insurance industry of 29.90%. For example, New York Life's liabilities grew at the national average rate (29.92%) over the past five years. Other peer insurers have a dramatically lower growth rate than Athene: TIAA (15%) and Nationwide (25%). A diligent and thorough investigation into Athene's surplus would have disqualified Athene from being selected as the "safest available" annuity provider based on these factors alone.

121.    Athene also has a very high concentration of risky assets relative to its surplus. Higher-risk assets broadly include the following categories: commercial mortgages, mezzanine real estate loans, residential or commercial mortgage-backed securities, derivatives, affiliated party instruments, private credit, and "other loan-backed" bonds. For 2022, Athene reported $21 billion in "other loan-backed and structured securities" compared to only $2 billion in surplus. New York Life, on the other hand, reported $11.7 billion for those securities, which was significantly less than its $23.88 billion surplus.

122.    Athene also held $18 billion in "Deposit type contracts" for 2022 compared to $2 billion in surplus. These contracts are effectively funding-agreement-backed notes and are not reported as debt. Because they are callable by institutional investors, in the event of a market downturn, Athene would likely experience a liquidity crisis. As a result, Athene has overstated its actual liquidity, further contributing to the risk assumed by annuitants. The concerns about

28

Athene's complex and risky investment strategies in the event of a market downturn were present in 2018 and 2019.

123.    Athene also reports a very large amount of modified co-insurance ("ModCo") arrangements with its Bermuda affiliates.

124.    ModCo arrangements are those in which an insurer (the "ceding carrier") transfers regulatory capital requirements associated with its asset risks to reinsurers while maintaining both the premiums and reserves associated with the reinsured policies on its balance sheets. These arrangements create the appearance that the ceding carrier is financially stronger than it actually is. They are particularly risky for pensioners severed from ERISA plans by Pension Risk Transfers. In 2022, Athene reported ModCo transactions totaling $104 billion compared to only $2 billion in surplus. For 2023, Athene reported ModCo transactions totaling over $141 billion relative to only $2.9 billion in surplus. In contrast, New York Life, TIAA, and Nationwide Life reported *no* ModCo with offshore affiliates.

125.    Such arrangements allow Athene to remove risky assets from its own reported Risk Based Capital ("RBC") ratio. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay policyholders (or annuitants) based on its level of risk. Athene's use of ModCo arrangements has the effect of artificially inflating its RBC ratio, which in turn allows Athene to hold a substantially lower amount in minimum required surplus. That is because, in Bermuda, insurers who hold riskier assets with higher credit spreads (or higher returns) are able to value their liabilities using a lower discount rate. Athene's manipulation of its RBC ratio masks just how risky annuities from Athene are.

126.    Athene's excessive use of offshore affiliated reinsurance, including ModCo, therefore obscures its true financial condition and exposes pensioners, including Plaintiffs, to even more substantial risk.

127.    As of year-end 2023, Athene reported over $155 billion in assets reinsured with affiliates, and its total liabilities reinsured by affiliates exceeded 5,000% percent of its surplus.

128.    Put simply, Athene's use of financial alchemy makes it dramatically under-reserved today.

129.    And today Athene's affiliated transactions are, on information and belief, also dramatically understated. It is publicly known that Apollo has had a long-term practice of bundling asset-backed notes and selling those notes to Athene in exchange for upfront cash and future management fees.  This practice dates back to at least 2018-19.

130.    Athene's investment in affiliated assets illustrates its higher risk because when an annuity provider is hit by an adverse regulatory event, its affiliated investments suffer a more significant and rapid asset value write-down compared to unaffiliated investments. These affiliated investments are highly dependent on affiliated carriers (Athene Annuity Re Ltd.) for operating cash flow. From 2019 through 2023, Athene went from $4 billion to $19 billion in affiliated investments, while New York Life's affiliated investments increased from $17 billion to $23 billion over the same period. The percentage increase among these carriers illustrates the dramatic increase in affiliated assets of Athene relative to New York Life. Over the five-year period, Athene's growth in affiliated assets was 368%, whereas New York Life's affiliated asset growth rate was 33%.

131.    Athene is also a prime example of a Risk-Taking Insurer that has used what experts refer to as the "Bermuda Triangle Strategy" to generate profits. The first side of the triangle is the

30

U.S. life insurer (e.g., Athene), which builds a block of annuity business through Pension Risk Transfers like the one at issue here. The second side of the triangle is the affiliated offshore reinsurers (e.g., Athene Life Re Ltd.), which accept the purchased insurance liabilities from the insurer and thereby free up annuity capital for use in the organization's private debt business. And the third side of the triangle is the affiliated asset manager (e.g., Athene Asset Management) which originates, acquires, and manages private debt.

132.    This triangle is unstable. The interdependence between Athene and its in-house reinsurer exposes each of these entities to a heightened risk of failure. The risks that Athene's accounts would be insufficient to cover its liabilities, forcing Athene to seek payment from its affiliated reinsurer for a portion of the annuity liabilities, are closely correlated events that are tied to Athene's weak financial condition relative to other insurers. Because Athene is dramatically under-reserved relative to peers, as shown by its thin surplus and dramatic increase in liabilities, in a liquidity crisis or shortfall, it would be entirely dependent on IOUs from its own captive in-house reinsurer, which is essentially itself. And any inability to satisfy Athene's general account obligations would cause a downgrade in its credit preventing it from raising funds in the credit markets.

133.    An analysis of Athene's transfer activity among affiliates further illustrates the heightened risk of Athene. Athene Annuity Re Ltd of Bermuda had $87 billion in assets on its books in 2020. Circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021. If only a fraction of that reinsurance transferred in 2021 was disallowed, Athene would face a funding shortfall. A funding shortfall for Athene would directly impact Apollo because Athene-affiliated insurance companies represent 40% of Apollo's value.

31

134.    Athene claims to have a "separate account" to pay Plaintiffs and other similarly situated Bristol-Myers retirees and beneficiaries their benefits. But, on information and belief, this separate account is not truly "ring-fenced" or insulated from Athene's general liabilities. According to group annuity contracts issued by Athene for other similar Pension Risk Transfers, the separate account not only holds assets supporting the contract, but assets in the separate account may also be used to support Athene's payment obligations under other, separate group annuity contracts issued by Athene. And Athene has the right to, periodically, withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceeds Athene's liabilities under the group annuity contracts, as determined by Athene's own staff.

135.    In sum, Athene's use of riskier investments and interrelated corporate strategies is in stark contrast to traditional insurers. For instance, New York Life maintains substantially more traditional, lower-risk investments than Athene and engages in no captive reinsurance.

136.    Apollo has expressly recognized that Pension Risk Transfers involving its affiliated companies may generate conflicts of interest relating to the group annuity contract purchase price and the amount of investment management/advisory fees that Apollo affiliates charge for managing the underlying pension assets and liabilities. Despite this admission, Apollo has undertaken no efforts to mitigate those conflicts.

137.    If Defendants had undertaken a diligent, thorough investigation into Athene, Athene would have been disqualified from being selected as the annuity provider for the annuitization.

***Athene Shares Common Characteristics with Recently Failed Insurers***

138.    An evaluation of the practices employed by recently failed insurers and Athene reveals several significant similarities. Athene continues to use practices that have been historically recognized by industry professionals as placing an insurer at a substantial likelihood of impairment, default, or insolvency.

139.    In 2024, four insurance companies failed: Columbian Life Insurance Company ("Columbian Life") and Columbian Mutual Life Insurance Company ("Columbian Mutual"), PHL Variable Insurance Company ("PHL Variable"), and 777 Reinsurance Ltd. ("777 Re"). Their failures demonstrate that the same issues that brought down Executive Life remain relevant today, including surplus inadequacy, risky financial practices, and inadequate risk management, among others.

140.    Columbian Life was one part of a complex network of affiliated entities under parent company Columbian Mutual. Like the practices employed by Athene, Columbian Life and its affiliates held complicated and intertwined financial obligations to one another and engaged in multiple levels of offshore reinsurance. Ultimately, these circular affiliated transactions, coupled with the company's declining financial health and inadequate reserves, led to its insolvency. Columbian Mutual's complex and opaque structure and involvement in affiliated transactions allowed the company to disguise its growing financial strain until regulatory intervention was required.

141.    Prior to its takeover by regulators, an independent actuarial analysis performed on behalf of the New York Department of Financial Services found Columbian Life's reserves to be significantly deficient. The company needed to increase its reserves by $104 million. Shortly thereafter, Columbian Life was placed into rehabilitation by the Illinois Department of Insurance.

In August 2024, Columbian Mutual was placed into rehabilitation in New York and policyholders remain at substantial risk.

142.    PHL Variable faced financial challenges similar to those faced by Columbian Life, including, among other things, underperforming investments and a prolonged low-interest-rate environment. PHL Variable attempted to stabilize itself through reinsurance transactions, including with its affiliates and captives. As discussed further below, Athene engages in the same risky practices of using an excessive amount of affiliated reinsurance relative to its surplus. When these efforts proved futile, regulators took over PHL Variable and initiated rehabilitation proceedings to protect policyholders and stabilize the company.

143.    A common theme among collapsing insurers is the pursuit of higher returns through less-liquid, more volatile assets and the use of opaque affiliated reinsurance transactions. These strategies can generate short-term profits but expose insurers, like Athene, to significant risk if market conditions change, leaving them unable to liquidate assets to meet policyholder demands.

144.    Much like the failed insurers of the past, 777 Re, a Bermuda-based entity, engaged in complex and opaque financial arrangements with affiliates. Through these transactions, 777 Re's parent company (777 Partners) shifted liabilities off of its balance sheet and misled regulators and investors to believe that it was financially sound. In reality, the affiliated reinsurance transactions just obscured 777 Partners' significant exposure and perilous financial status. Similar to Columbian Mutual, policyholders remain exposed.

145.    In addition to affiliated ModCo, 777 Partners' underlying investment portfolio contained high amounts of risky and illiquid assets in the name of higher returns. This strategy proved unsustainable, particularly when allegations of fraud surfaced at the 777 Partners level and the Bermuda Monetary Authority stepped in and unwound all of the affiliated ModCo transactions

34

by returning all remaining assets and all liabilities to the affiliated cedants. While these strategies of engaging in offshore, affiliated reinsurance transactions and holding high concentrations of risky assets can improve a company's financial position on paper and allow it to boast high returns, the risks introduced are significant, especially for those reinsurers that are undercapitalized and domiciled offshore.

146. Athene shares many similarities to these failed insurers based on objective measures.

147. Athene's surplus-to-liability ratio is comparable to three recent failed insurers: Columbian Life, Columbian Mutual, and PHL Variable. For example, as of the end-of-year 2023, Athene had a surplus-to-liability ratio of 1.44%. In contrast, Columbian Life had a surplus-to-liability ratio of 3.01% and Columbian Mutual had a surplus-to-liability ratio of 2.10%. As of year-end 2022, the last year that PHL Variable reported a positive surplus, its surplus-to-liability ratio was 1.03%. As previously indicated, their ratios are dramatically below the national average among insurers of 7.49%.

148. Like the failed insurance companies, Athene engages in affiliated reinsurance that far exceeds its surplus. For example, as of December 31, 2023, Athene's use of affiliated reinsurance was fifty-four times the amount of its surplus. Similarly, Columbian Mutual's affiliated reinsurance was twenty times the amount of its surplus; Columbian Life's was sixty times; and PHL Variable's was ninety times. By contrast, New York Life does not engage in *any* affiliated reinsurance.

***Athene Is Not Sufficiently Creditworthy to Ensure Payment of Plaintiffs' Retirement Benefits.***

149.    Objective measures illustrate that the annuities that Bristol-Myers purchased from Athene were not the safest annuities available and instead are many times riskier than many annuities available from traditional insurers.

150.    At least one set of independent analyses (the "NISA Reports") has explained why an ERISA plan sponsor may not, consistent with its fiduciary duties and the risk factors outlined in IB 95-1, transfer pension liabilities to Athene. The NISA Reports found that industry-wide Pension Risk Transfers to lower quality insurers, like the transfer at issue here, harm pensioners by as much as $5 billion annually through uncompensated credit risk.[1]

151.    The NISA Reports quantify the extent to which Athene is neither a safe nor a reasonable annuity choice for ERISA fiduciaries. The reports conclude that Athene is substantially riskier than multiple traditional annuity providers and is from 5% to 14% riskier than safer, traditional insurers.

152.    The findings of one such report is illustrated by NISA's Figure 2 below.

---

[1] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.  The NISA Reports assess relative risk as of 2022 but, on information and belief, comparable levels of risk for Athene existed in 2018 and 2019.



**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

153.    The NISA Reports reach their conclusions about insurers' relative risk by using the bond market as a measure of risk—a necessity given the NISA Reports' finding that certain insurance company balance sheets are exceedingly complex and opaque, especially given the use of Bermudian reinsurers.

154.    The bond market provides a market-based measure of creditworthiness because a bond's spread over U.S. Treasuries is the additional compensation an investor demands to accept the credit risk of holding a bond from a particular issuer as compared to the U.S. government. This additional compensation over U.S. Treasuries is referred to as the "risk premium" for a given bond.

155.    The NISA study excerpted above found that the market price of Athene's bond risk is 21.4% higher than U.S. Treasuries, as compared to the safest annuity provider analyzed by the study (New York Life), whose market price is 7.4% higher than U.S. Treasuries. The risk premium for Athene's bonds was thus almost three times the risk premium for New York Life.[2]

---

[2] *Id.,* Figure 2.

156.    The analysis thus labeled Athene as a "QUESTIONABLE CANDIDATE[]" the selection of which would "DEMAND[] EXTENUATING CIRCUMSTANCES," compared to three other providers that were "CLEAR CANDIDATES."

157.    In fact, this analysis understates the true risks to beneficiaries of a plan transferring benefits liabilities to Athene. The market spread on bonds is set by the marginal buyer, a buyer who by definition would have bond holdings that represent only a small portion of that buyer's overall, diversified portfolio. By contrast, the pension of a typical retiree receiving an annuity is a significant portion of their retirement income. Such retirees would, if they had a choice of annuity provider (which Plaintiffs did not have in this case), demand additional compensation for Athene's riskiness.

158.    The analysis separately compared the agency rating of Athene to its market-adjusted implied rating based on the bond market. The analysis found that although Athene had an A+ rating (like Executive Life before its downfall), Athene's implied rating was BBB-, the lowest rating among all reported annuity providers.[3]

---

[3] *Id.,* Figure 1.

FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness

| | (A) NY Life | (B) Prudential | (C) MassMutual | (D) AIG | (E) MetLife | (F) Principal | (G) PacLife | (H) F&G | (I) Athene |
|---|---|---|---|---|---|---|---|---|---|
| Agency Rating | AAA | AA- | AA+ | A | AA- | A+ | AA- | A- | A+ |
| Market Implied Rating | AA | AA | AA | A+ | A | A- | BBB+ | BBB | BBB- |
| Observed Market Spread | 74 | 76 | 84 | 102 | 106 | 147 | 158 | 186 | 214 |

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Source: Bloomberg, 8/31/2022 NISA calculations.

159. The reported range in (NISA) Figure 1 above is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch").

160. An A+ rating for Athene noted above should not be interpreted as suggesting that Athene is on par with safer annuity providers. As shown, there are levels of safety above A, including AA and AAA. New York Life and MassMutual, for example, maintain higher credit ratings due to their stronger creditworthiness.

161. The differences in credit ratings have a material impact on the likelihood of default. Athene has a Moody's rating of A1 (or A+ for S&P) in contrast to New York Life, which maintains a credit rating of Aaa (or AAA for S&P).

39

162.    Moody's has reported the average cumulative issuer-weighted default rates by issuer credit rating from 1970 through 2021. Over a 20-year time horizon, the default rates for riskier issuers are apparent. The default rates are only 0.7% for Moody's Aaa ratings compared to 5.0% for its A ratings. Thus, over a 20-year time horizon, the default rate of bonds with Athene's rating is almost seven times higher than those of a high-credit quality issuer. And the differential among default rates for them would be even greater over a 30-year time horizon. This differential is yet another indicator of the risk that pensioners have been forced to assume by Defendants' selection of Athene.

163.    Athene's transition out of the life insurance business also contributes to its higher risk as an annuity provider. An insurance company that provides life insurance has a natural hedge to an annuities business. In 2013, most of Athene's life insurance business was acquired by another company, Accordia Life and Annuity Company, and by 2016, Athene had completely transitioned out of the business. Therefore, the important hedge to Athene's annuities business of providing life insurance no longer exists.

164.    Put simply, Athene today is, according to multiple objective measures, the least safe annuity provider—even among the category of least safe annuity providers. The annuities purchased by Bristol-Myers were thus not safe, much less the safest annuities available.

165.    The Plan participants whose benefits have been annuitized through the Pension Risk Transfer with Athene receive none of the upside of Athene's inherently risky "value proposition." The risk posed by Athene could be worthwhile to Plan participants, at least theoretically, if they were to enjoy increased benefits that compensated them for Athene's risk of failure. But that is not the case for Plan participants, and it is never the case for defined benefit plan participants, because their benefits are fixed.

*Athene Relies on Unreliable, Private Letter Ratings.*

166.    Since at least 2017, Athene has also relied on unreliable and misleading credit ratings from suspect private credit rating organizations, which should have been a cause of serious concern to Defendants when they decided to annuitize Plaintiffs' pension benefits.

167.    The CLOs in which Athene invests are a type of structured debt divided into different tranches with varying risks and returns, so their creation depends on private letter ratings from private credit rating agencies rather than more stringent public ratings from the Securities Valuation Office of the National Association of Insurance Commissioners ("NAIC") and those provided by major rating agencies, such as S&P, Moody's, and Fitch. Two such private credit rating agencies from which Athene obtains ratings are Kroll Bond Rating Agency ("KBRA") and DBRS Inc. ("DBRS").

168.    In 2019, the Wall Street Journal ("WSJ") found significant discrepancies among structured securities ratings, including those of CLOs, between the major ratings agencies and the so-called "challenger" ratings agencies—DBRS, KBRA, and Morningstar. The WSJ found that across most structured-finance segments, challengers were more likely to give higher grades than the major ratings agencies on the same bonds, resulting in the classification of a bond as "junk" by major ratings agencies while challenger rating agencies would rate it as a very safe AAA bond.

169.    This problem persists because bond issuers can pay for their ratings by choosing to purchase ratings from only those agencies which are more likely to issue higher ratings. According to the WSJ, there is an added incentive to hire the most lenient rating firm, because interest payments are lower on higher-rated bonds. And as major ratings agencies lose out on business to more lenient challenger ratings agencies, they adjust their standards downwards so that they can

41

continue to compete. These ratings are important because a higher-rated structured security requires lower levels of capital to be held by the insurer.

170. Both KBRA and DBRS have been fined millions of dollars by the SEC based on their rating practices, and the SEC recently found that KBRA failed to establish, maintain, enforce and document the required policies and procedures surrounding their ratings of certain CLOs, resulting in inaccurate ratings that did not fully account for cash flows payable to noteholders and which would almost certainly pose a threat to policyholders in the case of insolvency. DBRS has also paid millions of dollars in civil penalties for violating Section 17(a)(1) of the Exchange Act and Rule 17g-2(b)(7) related to its internal credit rating practices.

171. Despite years of documented wrongdoing by KBRA and DBRS, involving extensive failures to comply with SEC credit rating policies and procedures, Athene continued to retain both companies for rating services. Indeed, KBRA and DBRS provided private rating services to Athene from 2017 through 2023. Athene's reliance on these ratings agencies is a red flag, which Defendants either ignored or failed to identify, by failing to properly vet Athene before selecting it as the annuity provider.

### Athene Has Been the Subject of Investigation and Was Found to Have Violated the Law.

172. Athene has been investigated by the State of New York for misconduct regarding its Pension Risk Transfer business and was found to have violated New York law. In January 2019, the New York State Department of Financial Services initiated an investigation into Athene Annuity and Life Company and Athene Holding Ltd. The agency concluded from its investigation that Athene Annuity and Life Company had violated New York law by conducting insurance business related to its Pension Risk Transfer business without a license. As a result of the investigation, Athene Annuity and Life Company and Athene Holding Ltd. were ordered to pay a

$45 million civil monetary penalty and satisfy other conditions. But its risky conduct has not changed.

### *The Bristol-Myers–Athene Transaction*

173.    In or around November 2018, Bristol-Myers and The Pension Committee engaged State Street to assist Bristol-Myers in offloading its pension liabilities.

174.    Specifically, Bristol-Myers and The Pension Committee engaged State Street's "Independent Fiduciary Services" team to assist in the process of selecting an annuity provider.

175.    State Street has publicly stated that it is "[b]lazing the trail into the mega-pension transfer market."

176.    A key service offered by State Street's Independent Fiduciary Services team—and, according to State Street, "often one of the reasons why companies decide to hire" supposedly independent fiduciaries like them—is that hiring State Street, as a third-party and purportedly neutral advisor, "may help in the event of litigation."[4]

177.    When State Street represents that hiring it "may help in the event of litigation," it means that engaging it to assist with annuitization helps provide employers with supposed legal cover in the form of a justification that IB 95-1 and ERISA are complied with when State Street plays a role in the selection of an annuity provider.

178.    In fact, State Street has conceded the applicability of IB 95-1 to annuitizations like the one at issue here, both publicly and in legally binding documents.

179.    State Street represents, for example, that its "team of independent fiduciary services specialists continue to support clients seeking to transfer liabilities to insurance companies in the

---

[4] https://www.ssga.com/us/en/institutional/ic/insights/how-independent-fiduciary-services-evolved.

43

form of annuitizations" in light of the new insurance landscape that, according to State Street, has "increased 'safest available annuity' options available to independent fiduciaries and other fiduciaries." *Id.* (quoting and citing IB 95-1).

180.    And State Street has represented in its engagement agreements for similar Pension Risk Transfers that it will perform its work in selecting an annuity provider "in accordance and compliance with ERISA, including the requirements of the U.S. Department of Labor's IB 95-1."

181.    In advising Bristol-Myers to offload the pension liabilities, State Street was acting as a fiduciary of the Plan. State Street received financial compensation for the services it provided to Bristol-Myers.

182.    Based on a decision made by Bristol-Myers and The Pension Committee on State Street's recommendation, Bristol-Myers and Athene entered into what Bristol-Myers has called a "first-of-its-kind-plan termination solution."

183.    The "solution" involved terminating the Plan and offloading billions of dollars' worth of pension benefit obligations to Athene.

184.    From Bristol-Myer's perspective, the upside of the "solution" was, in its words, to reduce Bristol-Myers Squibb's future risk and administrative costs.

185.    The annuitized pension benefits approximated $2.6 billion and were offloaded in two tranches: one in August 2019 and one in October 2019, while the Plan was terminated effective February 1, 2019.

186.    Those group annuity contracts resulted in the annuitization of thousands of Plan participants.

187.    Bristol-Myers had an acute incentive to purchase a cheap annuity because 2019 was a relatively low interest rate environment, which meant that annuity prices were relatively high.

44

188.    Bristol-Myers' incentive to purchase cheap, risky annuities was further heightened by the fact that, in 2019, 93% of Plan participants and 86% of the liabilities in the Plan were associated with "active" and "terminated vested" participants.

189.    Annuities for "active" and "terminated vested" participants (those who *have not* begun to receive benefits) are generally more expensive than annuities for "pay status" participants (those who *have* begun to receive payments) not only because pensioners are generally older than active and terminated vested participants, but also because there is greater risk and uncertainty related to the timing, form, and amount of future payments when the participant has not yet begun to receive payments.

190.    Thus, from Bristol-Myers' perspective, the overwhelming majority of participants in the Plan in 2019 were "bottom-of-the-barrel" participants who would be relatively expensive to annuitize—a fact that increased the incentive for Bristol-Myers to prioritize obtaining a cheap annuity for those individuals.

191.    Indeed, this scheme required the implementation of the largest-ever full plan termination involving mostly "active" and "terminated vested" participants.

192.    Bristol-Myers used Plan assets—and none of its own corporate assets—to purchase the group annuity contracts.

193.    Bristol-Myers also used Plan assets to pay State Street $210,000 in 2019.

194.    Upon information and belief, some or all of those funds were used to pay State Street for the group annuity contract-related services that State Street provided to Bristol-Myers.

195.    Bristol-Myers also used Plan assets to pay Athene $194,093 for insurance services in 2019. That payment was related to the annuitization, but was not the premium payment that Bristol-Myers paid Athene to offload the pension obligations.

196. Bristol-Myers has not publicly disclosed the reason for that payment.

197. Athene is now solely responsible for paying Plaintiffs' monthly benefits; Plan participants covered by the transfers have been terminated as participants in the Plan; and such participants no longer enjoy any of the benefits intended by Congress under ERISA, including the protections and backstop provided by the PBGC.

198. Bristol-Myers entered into the group annuity contracts because it anticipated a large corporate benefit from offloading the liabilities, given that Athene's annuities were substantially cheaper than the far safer annuities offered by traditional insurers.

199. The annuities sold to Bristol-Myers by Athene were in fact cheaper than those offered by traditional insurers.

200. The selection of Athene as the annuity provider thus enabled Bristol-Myers to enjoy millions in economic gain.

201. And the annuitization scheme resulted in the recovery of approximately $419 million in "surplus" Plan assets by Bristol-Myers, which could then use these assets at its discretion. In fact, it used this recovery to pay a completely different general corporate obligation—to fund future matching employer funds for participants in its distinct and separate defined-contribution plans, boosting profits by saving the company the money it would have otherwise been required to pay from corporate revenues.

202. Bristol-Myers also took as a reversion an additional $381 million in surplus Plan assets that had been set aside in an account to provide retiree medical benefits for participants.

203. Had Bristol-Myers, The Pension Committee, and State Street selected an annuity provider that was safer and more expensive than Athene, these surpluses would have been far smaller.

204. Bristol-Myers benefited dollar-for-dollar from the savings resulting from the selection of Athene as the annuity provider.

205. That reversion of surplus to Bristol-Myers is only a small portion of the financial advantage that it has reaped and will reap from the transaction.

206. Bristol-Myers will, in addition, enjoy administrative cost savings due to annuitizing the thousands of Plan participants. Because the benchmark range of such costs is $50–100 per participant per year, Bristol-Myers has likely profited and will likely profit by millions of dollars in saved administrative costs over the lifespans of its annuitized retirees.

207. Bristol-Myers will also profit from the transaction by saving on flat-rate and variable-rate premiums that are paid to the PBGC to insure the benefits of the annuitized retirees.

208. Because of the annuitization, Bristol-Myers and the Plan are no longer required to pay annual flat-rate PBGC premiums for the participants terminated from the Plan, which will save Bristol-Myers millions more annually.

209. And the amount of variable-rate premiums over the lives of the retirees was also likely to be substantial, measuring in the millions of dollars. It is likely that Bristol-Myers had historically paid significant amounts of this additional premium.

210. All told, Bristol-Myers' additional economic gains from the avoided premiums likely measure in the tens of millions of dollars, if not more.

211. Although State Street was nominally engaged to provide compliance advice to Bristol-Myers to ensure that Bristol-Myers selected an annuity provider in satisfaction of its fiduciary obligations, State Street's true role was to give the appearance of legitimacy to Bristol-Myers' selection of Athene as an annuity provider.

212.    On information and belief, Defendants did not conduct an independent, impartial investigation aimed at identifying and selecting an annuity provider in Plan participants' best interests.

213.    Objective indicia regarding Athene—including the publicly available information alleged herein about Athene's risk, structure, and financial undertakings—would have caused a prudent and loyal fiduciary to conclude that Athene was not the safest annuity provider available.

214.    The risk posed by Athene as of 2018–19 would have been ascertainable to sophisticated business entities with fiduciary obligations, such as Bristol-Myers, The Pension and Management Committees, and State Street, had they conducted an independent, impartial investigation aimed to identify the safest annuity provider available.

215.    In the Pension Risk Transfer industry, plan fiduciaries customarily solicit bids and information from insurers to ensure that the transfer is in the plan participants' best interest.

216.    Given the extensive information available to Defendants that would have led a prudent fiduciary to reject Athene based on objective measures, Bristol-Myers and State Street either did not solicit bids and other information from a sufficient number of providers that would have revealed that Athene was not a safe selection (or ignored or unreasonably disregarded such information), or they did not engage in an independent or reasoned-decision making process before selecting and transferring pension benefits to Athene.

217.    Without engaging in such process, Defendants could not determine whether the use of Athene as the Plan's annuity provider was prudent or in the best interest of Plan participants and beneficiaries. Had they engaged in the careful, independent, and deliberative process that ERISA mandates, Defendants would have known that Athene was not the safest available annuity

provider, and they would not have placed Plaintiffs' pension benefits and future retirement income payments at substantial risk of Athene's insolvency.

218.    When Bristol-Myers and State Street selected Athene as the entity to which they would transfer billions of dollars' worth of pension liabilities, they made a choice that was not safe or prudent.

219.    Nor did Bristol-Myers and State Street make the safest available choice or the choice that was in the best interest of Plan participants; in fact, they did the opposite.

220.    Indeed, both in 2018–19 and today Athene flunks multiple tests for whether an annuity provider is a safe choice, including because (i) Athene lacks a sufficient track record to be entrusted with guaranteeing such a massive amount of pension liabilities (and lacked it to an even greater degree in 2018–19); (ii) Athene today is, compared to traditional providers, invested in riskier assets to support participants' payments, (iii) Athene's risk is increased by its reinsurance of annuities with offshore companies affiliated with Athene which are not as transparent or required to set aside as much capital as U.S.-based insurers; (iv) Athene uses excessive amounts of ModCo to artificially inflate its Risk Based Capital ratio; and (v) the risks inherent in Athene's strategies are magnified by unstable economic conditions.

221.    Although State Street was hired by Bristol-Myers and The Pension Committee as an "independent fiduciary" to select or recommend Athene as the Plan's annuity provider, State Street owed the same stringent fiduciary obligations as Bristol-Myers and The Pension Committee.

222.    As the appointing fiduciaries, Bristol-Myers and The Pension Committee maintained full responsibility to monitor State Street to ensure that it carried out its fiduciary obligations loyally and prudently. They were required to take prompt and effective action to protect the Plan participants when their delegate fails to discharge its duties.

223.    Through the transfer of Bristol-Myers' pension obligations to Athene, Bristol-Myers and The Pension Committee failed to discharge their duty to monitor State Street.

224.    Accordingly, based on this information and that available to sophisticated entities like Bristol-Myers and State Street, the selection of Athene would have been an imprudent choice, even if the selection of Athene had not led to an attendant economic benefit for Bristol-Myers and even if Athene's pricing was not more favorable to Bristol-Myers than that of a traditional annuity provider.

*Bristol-Myers and State Street Worked Under Conflicts of Interest of Their Own Making When They Selected Athene for the Annuitization.*

225.    It should come as no surprise that State Street—ignoring the public red flags attached to Athene—has routinely rubber-stamped Athene as an annuity provider to displace retirees' longstanding, valuable rights to ERISA-protected pension benefits.

226.    The "partnership" struck between Bristol-Myers and Athene was critical to Athene's success as a new entrant to the Pension Risk Transfer market.

227.    Athene first engaged in a Pension Risk Transfer in August 2017, valued at $320 million. Before the $2.6 billion Pension Risk Transfer with Bristol-Myers, Athene's Pension Risk Transfer transactions totaled only $4.1 billion. The Plan's assets increased Athene's Pension Risk Transfer line of business by nearly 63% and accounted for more than half of Athene's book of Pension Risk Transfer business prior to the transaction.

228.    Since 2018, State Street has recommended Athene for no fewer than ten Pension Risk Transfers, shifting more than $30 billion in pension liabilities from the federally regulated pension system to Athene.

229.    And State Street has apparent financial incentives to recommend Athene to serve as the annuity provider in Pension Risk Transfers.

230.    For one, State Street offers a financial product backed by Athene.

231.    And Apollo and State Street have announced their intention to jointly launch a first-of-its kind, actively managed exchanged-traded fund ("ETF") that invests in public and private credit. Independent market analysts have reported that the plan to offer the ETF raises conflict of interest and self-dealing concerns.

232.    State Street is also one of the largest shareholders of Apollo. In particular, between 2020 and 2023, State Street has been the sixth to tenth largest institutional investor in Apollo.

233.    And State Street provides custodial services for Athene's insurance products, according to its regulatory filings.

234.    State Street has also held a substantial ownership interest in Bristol-Myers since at least 2013. Indeed, from 2013 through 2024, State Street and its affiliates have held billions of dollars' worth of common shares of Bristol-Myers. Holders of publicly traded securities are entitled to vote on matters affecting corporate governance.

235.    Because State Street held such significant positions in Bristol-Myers and Apollo, it had a self-interest in increasing the value of its equity positions in both companies. State Street thus had an interest in favoring Bristol-Myers' selection of a cheaper annuity provider, like Athene, whose selection results in cost-savings for Bristol-Myers that redound to the benefit of shareholders.

236.    And State Street's significant holdings in Bristol-Myers' stock gave it substantial power to influence Bristol-Myers' strategies and activities, including through shareholder meetings. In fact, State Street has used its proxy voting power in alignment with Bristol-Myers' corporate interests.

237.    The relationship between State Street and Bristol-Myers is part of a well-documented incentive structure, wherein large shareholders who are also service providers (like State Street) offer favorable advice for corporate management; corporate management continues to engage the large shareholders for services and products; and the large shareholders maintain and increase their positions in the company.

238.    In contrast to Athene, at the time of the annuitization, at least one other annuity provider had billions of dollars' worth of assets under management from Pension Risk Transfers and a longstanding track record in the market. There were, moreover, over half a dozen annuity providers with thirty to one hundred years' worth of experience in the market.

239.    Under such circumstances it was not only imprudent and disloyal for Defendants to select Athene as the annuity provider, but also imprudent and disloyal for Bristol-Myers and The Pension Committee to select State Street as an "independent fiduciary" of the Plan, particularly because State Street had interests on all sides of the transaction.

240.    Bristol-Myers and The Pension Committee failed to engage in a thorough, independent investigation of available independent fiduciaries for the Plan.

241.    Had they conducted an impartial investigation of available independent fiduciaries they would have discovered that State Street had a relationship and dealings with Athene and Apollo that could and, upon information and belief, did impact the independence of the fiduciary services that State Street offered, especially given the numerous factors that would lead a loyal and prudent fiduciary to conclude that Athene's annuities were not safe, much less the safest annuity available.

***By shifting the responsibility to pay Plaintiffs' benefits to Athene, Defendants degraded the value of Plaintiffs' retirement benefits.***

242.    The Pension Risk Transfer to Athene immediately diminished the present value of Plaintiffs' benefits.

243.    The selection of Athene replaced the valuable benefits to which Plaintiffs were entitled with benefits that were substantially and quantifiably less valuable.

244.    Riskier assets are, all else equal, worth less than safer assets. Athene annuities have a higher credit spread relative to U.S. Treasuries, and thus have higher risk, than annuities offered by other insurers. That was also true when Defendants undertook the Pension Risk Transfer. Thus, the annuities from Athene are worth measurably less than the annuities would be worth if issued by another insurer.

245.    Athene is, in fact, one of the least safe annuity providers in the market.

246.    Before the annuitization, the risk that Plaintiffs would not receive the pension benefits to which they were entitled was negligible. There was no realistic probability that the Plan would not be sufficiently funded to pay the benefits *and* that Bristol-Myers would fail *and* that the PBGC would fail to pay Plaintiffs' benefits. There was no safer place for their pension benefits, or those of the proposed class.

247.    After the annuitization, the risk that Plaintiffs will not receive the benefits to which they are entitled is large. Because of the group annuity transactions, Plaintiffs are no longer participants in the Plan, and their monthly retirement benefits are thus backed by only Athene— not the Plan, Bristol-Myers, or the PBGC.

248.    Based on Athene's current and likely future financial position, there is a substantial probability that it will fail to make good on its obligation to pay Plaintiffs' retirement benefits, and the large economic gains realized by Bristol-Myers are at least a rough proxy for the harm to

53

retirees from being terminated as Plan participants and having their pension benefits transformed into a risky annuity with Athene.

249.   The transaction thus greatly increased the risk—and indeed created a substantial risk—that Plaintiffs will not receive the retirement benefits that they have earned and which they are owed.

250.   Plaintiffs had no ability to choose their annuity provider, and they had no role in the selection of Athene. Plaintiffs cannot withdraw their benefits from Athene.  And Plaintiffs have no way to transfer their benefits to a more secure annuity provider.

## CLASS ALLEGATIONS

251.   Plaintiffs are empowered by law to bring this action under 29 U.S.C. § 1132(a)(2), (a)(3) and (a)(9).

252.   Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23. They seek class certification on behalf of all participants and their beneficiaries in the Bristol-Myers Squibb Retirement Income Plan as of February 1, 2019, for whom the responsibility for plan-related benefit payments was transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York (the "Class").

253.   Numerosity: The Class, which includes thousands of members, is so numerous that joinder of all members is impracticable.

254.   Commonality: There are questions of law and fact common to the Class because Class members' claims are substantially identical to one another and predicated on the common contention that they were injured by the transfer of all or part of their pension liabilities to Athene in violation of ERISA. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include:

    i.  Did Bristol-Myers and The Management and Pension Committees breach their fiduciary duties when they selected Athene as the annuity provider?

    ii.  Did State Street breach its fiduciary duty when it assisted Bristol-Myers and The Pension Committee in entering into the transaction?

    iii.  Was the transaction *per se* unlawful under ERISA's prohibited transaction provisions?

    iv.  Should the Court order injunctive relief that ensures the Class will be able to obtain the value of their retirement benefits?

    v.  Should the Court order Bristol-Myers to disgorge the millions in profit that it secured from breaching its fiduciary duty?

255.    <u>Typicality</u>: Plaintiffs Doherty and Noel's claims are typical of the Class's claims. Their claims arise from the same conduct, and seek to redress the same legal violations, as the Class's claims.

256.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. They have no interests antagonistic to those of the other members of the Class. They are committed to the vigorous prosecution of this action. They have retained counsel who specialize in the substantive law of ERISA and pension plans, and who are experienced and competent in the prosecution of large class actions, including those arising under ERISA.

257.    <u>Rule 23(b)(1)</u>: The prerequisites for a (b)(1) class are satisfied. Prosecution of separate actions by Class members would risk establishing incompatible standards of conduct for Defendants. Additionally, adjudications as to individual Class members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

258.    Rule 23(b)(2): The prerequisites for a (b)(2) class are satisfied. Defendants' misconduct was generally applicable to the Class. The injunctive relief that Plaintiffs seek affects the Class as a whole. Individual Class members do not have an interest in prosecuting their claims in this action individually because Class members' claims are identical and the injunctive relief sought will affect each Class member equally.

259.    Rule 23(b)(3): The prerequisites for a (b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class-wide proof. Class-wide litigation of this action is also superior to individual litigation because there are no difficulties in managing this case as a class action and there is a strong need to concentrate the Class members' claims in one action.

## COUNT I: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES
*Against all Defendants for the Selection of Athene*

260.    The foregoing allegations are incorporated by reference herein.

261.    All of the Defendants were, at all relevant times, Plan fiduciaries.

262.    Under 29 U.S.C. § 1104(a)(1), they were thus required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." This duty requires that ERISA plans be operated for the "exclusive benefit" of plan participants, and ERISA relatedly provides that, except in limited circumstances inapplicable here, "the assets of a plan shall never inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1). Defendants were also required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

263. IB 95-1 summarizes the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a Pension Risk Transfer. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available" and fiduciaries may never select an unsafe annuity. Fulfilling the duty of prudence requires an objective, thorough, and analytical search for a suitable annuity provider.

264. Defendants breached these fiduciary duties of loyalty and prudence when they selected Athene as the annuity provider to receive Plaintiffs' pension liabilities for their own financial advantage.

265. Athene was neither a safe nor reasonable annuity provider.

266. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available, and Defendants selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving Bristol-Myers money and enhancing corporate profits. In so doing, Defendants breached their duty of prudence by selecting an unsuitable annuity provider and breached their duty of loyalty by favoring their own corporate interests over the participants' interests in a secure retirement. Defendants' goal was to save Bristol-Myers money and State Street's goal was to further its line of business that recommends Athene as an annuity provider. Consequently, their search and selection of Athene was biased in favor of the lower-cost provider and neither objective nor sufficiently thorough or analytical, thereby breaching their duty of prudence.

267. The transfer of Plaintiffs' pension obligations to Athene has injured Plaintiffs.

268.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/costs savings pocketed by purchasing Athene annuities instead of the safest annuity available, and the posting of security to assure receipt by Plaintiffs and Class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

269.    In addition to breaching their own fiduciary duties, Defendants knowingly participated in each other's fiduciary breaches: they knew each other's acts were a breach of fiduciary duty, enabled the breach, and failed to make any reasonable effort under the circumstances to remedy the breach. They are thus liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

270.    The Bristol-Myers Defendants are also liable for failing to monitor State Street, which they engaged to assist in the selection of annuity provider. The Bristol-Myers Defendants failed to ensure that the process of selecting Athene as the annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A)–(B) and IB 95-1. Had the Bristol-Myers' Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of a safer annuity provider or the Bristol-Myers Defendants would have decided not to proceed with the transaction.

271.    Bristol-Myers also separately breached its fiduciary duties with respect to The Pension and Management Committees. Bristol-Myers, through the Management Committee, whose members it appointed, selected and had the power to remove the members of The Pension Committee, and as such had the fiduciary duty to monitor The Pension Committee to ensure that it was satisfying its fiduciary duties as Plan administrator. Bristol-Myers failed to do so in breach of its fiduciary duties.

## COUNT II: KNOWING PARTICIPATION IN A FIDUCIARY BREACH RELATED TO AN INSURANCE ANNUITY
*Against all Defendants for the Selection of Athene*

272.    Paragraphs 1 through 259 are incorporated by reference herein.

273.    Sections 1132(a)(3) and 1132(a)(9) not only empower individuals to bring actions when their status as plan participants is terminated by annuitizations that violate ERISA, they also impose substantive duties on certain nonfiduciaries.

274.    Specifically, those provisions create liability for nonfiduciaries who knowingly participate in a fiduciary breach in violation of ERISA, 29 U.S.C. § 1104.

275.    Plaintiffs thus allege, in the alternative to Count I, that, even if any of the Defendants were nonfiduciaries for the purpose of the annuitization, that Defendant is liable under Sections 1132(a)(3) and 1132(a)(9) for participating in a fiduciary's ERISA violation. Among other things, all Defendants knew of the circumstances that rendered the other's conduct a breach of fiduciary duty and participated in that breach.

276.    Specifically, the Bristol-Myers Defendants engaged State Street for the purpose of selecting an annuity provider, knew that State Street's investigation of available annuity providers could not be objective or sufficiently thorough; knew that the deficient selection of Athene instead of a prudent alternative annuity provider would generate a massive corporate benefit for Bristol-Myers; and knowingly accepted that benefit by entering into the annuitization with Athene.

## COUNT III: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES
*Against the Bristol-Myers Defendants for the Selection of State Street*

277.    Paragraphs 1 through 259 are incorporated by reference herein.

278.    ERISA's fiduciary duties apply to the selection of service providers. 29 U.S.C. § 1104(a)(1)(A)–(B).

59

279. The Bristol-Myers Defendants separately breached their fiduciary duties by selecting State Street as the Plan's "independent fiduciary" for the purposes of the transaction.

280. The Bristol-Myers Defendants had a motivation to select State Street as an "independent fiduciary" because that selection benefitted the Bristol-Myers Defendants, including by ingratiating themselves to State Street, which had significant market power that would allow it to further Bristol-Myers' corporate interests.

281. Bristol-Myers' selection of State Street failed to consider how State Street's relationship with Apollo and Athene would impair its impartiality and judgment in selecting an annuity provider.

282. The Bristol-Myers Defendants' fiduciary breach in selecting an independent fiduciary facilitated the subsequent selection of Athene, which harmed Plaintiffs.

## COUNT IV: PROHIBITED TRANSACTION
*Against the Bristol-Myers Defendants; State Street as party in interest*

283. Paragraphs 1 through 259 are incorporated by reference herein.

284. Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

285. The Bristol-Myers Defendants were at all times fiduciaries to the Plan.

286. The Bristol-Myers Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and State Street.

60

287.    The Bristol-Myers Defendants also caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between State Street and the Plan.

288.    When Bristol-Myers and The Pension Committee caused the Plan to engage in the annuity transaction, State Street was a party in interest, including because State Street was a fiduciary of the Plan and a person providing services to the Plan. 29 U.S.C. § 1002(14). Bristol-Myers and The Pension Committee knew of that fact when they caused the Plan to engage in the annuity transaction.

289.    The Bristol-Myers Defendants knowingly participated in the breach of State Street, knowing that such acts were a breach, enabled State Street's commission of a breach by failing to lawfully discharge their fiduciary duties, knew of the breach by State Street, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciary under 29 U.S.C. § 1105(a), and would be liable even if they were deemed nonfiduciaries.

290.    The transaction does not qualify for any exemption from the prohibitions of Section 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene and State Street received more than reasonable and adequate compensation for the services provided to the Plan. *No* amount of compensation for Athene or State Street was reasonable or adequate under the circumstances.

### COUNT V: PROHIBITED TRANSACTION
*Against the Bristol-Myers Defendants; Athene as party in interest*

291.    Paragraphs 1 through 259 are incorporated by reference herein.

292.    The Bristol-Myers Defendants also caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or

61

indirect (i) exchange of property between the Plan and Athene; (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D).

293.    When Bristol-Myers and The Pension Committee caused the Plan to engage in the annuity transaction, Athene was a party in interest, including because Athene was a person providing services to the Plan. 29 U.S.C. § 1002(14). Bristol-Myers and The Pension Committee knew of that fact when they caused the Plan to engage in the annuity transaction.

294.    The transaction does not qualify for any exemption from the prohibitions of Section 1106. Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene and State Street received more than reasonable and adequate compensation for the services provided to the Plan. *No* amount of compensation for Athene or State Street was reasonable or adequate under the circumstances.

<u>**COUNT VI: PROHIBITED TRANSACTION**</u>
*Against State Street; the Bristol-Myers Defendants as parties in interest*

295.    Paragraphs 1 through 259 are incorporated by reference herein.

296.    State Street was at all relevant times a fiduciary to the Plan.

297.    State Street caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan, on one hand, and the Bristol-Myers Defendants, on the other hand; (ii) furnishing of services between the Plan and the Bristol-Myers Defendants; and (iii) the transfer to, or use by or for the benefit of Bristol-Myers and The Pension Committee, of Plan assets;

298.    When State Street caused the Plan to enter into the annuity transaction, the Bristol-Myers Defendants were parties in interest, including because they were fiduciaries of the Plan and

persons providing services to the Plan. 29 U.S.C. § 1002(14). State Street knew of these facts when it caused the Plan to engage in the annuity transaction.

299.    State Street knowingly participated in the breaches of the Bristol-Myers Defendants, knowing that such acts were a breach, enabled breaches by the Bristol-Myers Defendants by failing to lawfully discharge their fiduciary duties, knew of the breach by the Bristol-Myers Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. It is thus liable for the losses caused by the breach of their co-fiduciary under 29 U.S.C. § 1105(a).

300.    The transaction does not qualify for any exemption from the prohibitions of Section 1106. Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene and State Street received more than reasonable and adequate compensation for the services provided to the Plan. *No* amount of compensation for Athene or State Street was reasonable or adequate under the circumstances.

## COUNT VII: PROHIBITED TRANSACTION
*Against State Street; Athene as party in interest*

301.    Paragraphs 1 through 259 are incorporated by reference herein.

302.    State Street also caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan and the Athene, (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets.

303.    When State Street caused the Plan to enter into the annuity transaction, Athene was a party in interest, including because it was a person providing services to the Plan. 29 U.S.C. § 1002(14). State Street knew of this fact when it caused the Plan to engage in the annuity transaction.

304.    The transaction does not qualify for any exemption from the prohibitions of Section 1106. Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene and State Street received more than reasonable and adequate compensation for the services provided to the Plan.  *No* amount of compensation for Athene or State Street was reasonable or adequate under the circumstances.

### COUNT VIII: PROHIBITED TRANSACTION
*Against All Defendants*

305.    Paragraphs 1 through 259 are incorporated by reference herein.

306.    The Athene annuitization was also prohibited under 29 U.S.C. 1106(b).

307.    By using Plan assets to purchase Athene annuities instead of safe annuities, so as to increase Bristol-Myers' profits, the Bristol-Myers Defendants and State Street dealt with the assets of the Plans in their own interest or for their own account; and acted on behalf of parties (Bristol-Myers, Athene, and State Street) whose interest in using a riskier, lower-cost annuity provider were adverse to the interests of Plan participants and their beneficiaries in obtaining a safe annuity. 29 U.S.C. § 1106(b)(1)–(2).

### JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

### PRAYER FOR RELIEF

Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court:

> i. Certify the Class under Federal Rule of Civil Procedure 23, appoint Plaintiffs Doherty and Noel as Class representatives and appoint Zuckerman Spaeder LLP and Schlichter Bogard LLP as Class counsel to represent the members of the Class;

ii.  Issue an injunction assuring receipt by Class members of the amounts to be provided by the annuities, plus reasonable prejudgment interest on those amounts, 29 U.S.C. § 1132(a)(9);

iii.  Order the Defendants to guarantee the annuities purchased from Athene through the purchase, at their expense, of appropriate guarantees from reliable insurers selected through appropriate procedures or the posting of an appropriate security;

iv.  Order Bristol-Myers to remain secondarily liable for Plaintiffs' and the Class's pension benefits;

v.  Order disgorgement and monetary relief of all sums derived from the unlawful transaction; and/or

vi.  Order any appropriate relief this Court deems just and equitable.

Plaintiffs also seek reasonable attorneys' fees, costs, and pre- and post-judgment interest on any monetary compensation to which they are entitled.

Dated:  November 1, 2024

/s/ Cyril V. Smith
Cyril V. Smith*
ZUCKERMAN SPAEDER LLP
100 E. Pratt Street, Suite 2440
Baltimore, MD  21202
(410) 949-1145
(410) 659-0436 (Fax)
csmith@zuckerman.com

/s/ Bryan M. Reines
Bryan M. Reines*
ZUCKERMAN SPAEDER LLP
1800 M Street N.W., Suite 10000
Washington, D.C. 20036
(202) 778-1846
(202) 822-8106 (Fax)

/s/ Jerome J. Schlichter
Jerome J. Schlichter*
SCHLICHTER BOGARD LLP
Andrew D. Schlichter (Bar No. 4403267)
Sean E. Soyars*
Kurt C. Struckhoff*
Patrick R. Kutz*
Terrence W. Scudieri, Jr. (Bar No. 5761945)
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: +1 (314) 621-6115
Facsimile: +1 (314) 621-5934
jschlichter@uselaws.com
aschlichter@uselaws.com
ssoyars@uselaws.com
kstruckhoff@uselaws.com

breines@zuckerman.com

*/s/ Edward Stone*
Edward Stone (N.Y. Bar No. 2259489)
EDWARD STONE LAW P.C.
575 Lexington Ave., 14th Floor
New York, NY 10022
(203) 930-3401
(203) 348-8477 (Fax)
eddie@edwardstonelaw.com

*/s/ Elizabeth Hopkins*
Elizabeth Hopkins*
Susan L. Meter*
KANTOR & KANTOR LLP
19839 Nordhoff St.
Northridge, CA 91324
(818) 886-2525
(818) 350-6272 (Fax)
ehopkins@kantorlaw.net
smeter@kantorlaw.net

*Attorneys for Plaintiff Doherty & the
Proposed Class*

pkutz@uselaws.com
tscudieri@uselaws.com

*Attorneys for Plaintiff Noel & the Proposed
Class*

* Admitted *pro hac vice*

66

67

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ *Bryan M. Reines*
Bryan M. Reines